# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 23, 2012

No. 10-60039

Lyle W. Cayce
Clerk

CITY OF ARLINGTON, TEXAS; CITY OF SAN ANTONIO, TEXAS,

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF
AMERICA,

Respondents.

On Petitions for Review of an Order of the
Federal Communications Commission

Before DAVIS, PRADO, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

The City of Arlington, Texas and the City of San Antonio, Texas seek
review of a Declaratory Ruling and subsequent Order on Reconsideration that
the Federal Communications Commission (FCC or Commission) issued in
response to a petition for a declaratory ruling by a trade association of wireless
telephone service providers, CTIA—The Wireless Association® (CTIA).  In the
proceeding before the FCC, CTIA sought clarification of Sections 253 and
332(c)(7) of the Communications Act of 1934, as amended,[1] regarding local

---

[1] 47 U.S.C. §§ 253, 332(c)(7).

No. 10-60039

review of wireless facility siting applications. We deny Arlington's petition for review on the merits. We dismiss San Antonio's petition for review because we lack jurisdiction to consider it.

## I

As part of the Telecommunications Act of 1996 (TCA or the Act),[2] Congress amended the Communications Act of 1934 by adding Section 332(c)(7). That provision, codified as 47 U.S.C. § 332(c)(7), restricts the authority of state and local governments with respect to decisions regarding the placement and construction of wireless communications facilities. It provides:

(7) Preservation of local zoning authority

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof–

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

---

[2] Pub. L. No. 104–104, 110 Stat. 56.

No. 10-60039

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

Section 332(c)(7) seeks to reconcile two competing interests—Congress's desire to preserve the traditional role of state and local governments in regulating land use and zoning and Congress's interest in encouraging the rapid development of new telecommunications technologies by removing the ability of state and local governments to impede the construction and modification of wireless communications facilities through delay or irrational decisionmaking.[3]

---

[3] *See City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 115 (2005) ("Congress enacted the [TCA] to promote competition and higher quality in American telecommunications services and to encourage the rapid deployment of new telecommunications technologies. One of the means by which it sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." (internal quotation marks and citations omitted)); *T-Mobile Cent., LLC v. Unified Gov't of Wyandotte Cnty., Kan. City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008) ("Congress adopted the TCA in order to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies. The TCA furthered these goals by reducing the

No. 10-60039

Section 332(c)(7)(A), by providing that "nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities," acts to protect state and local government authority. Section 332(c)(7)(B), on the other hand, imposes "several substantive and procedural limitations that subject [state and local governments] to an outer limit upon their ability to regulate personal wireless services land use issues."[4]

In 2008, CTIA filed a petition for a declaratory ruling with the FCC in which it requested that the FCC clarify certain provisions of the Communications Act of 1934, including several of § 332(c)(7)(B)'s limitations. The petition asserted that ambiguities in the statute had allowed local governments to impede the placement and construction of wireless facilities, harming consumers' access to wireless services. CTIA's petition made four specific requests.

First, CTIA requested that the FCC provide guidance on what constitutes a "failure to act" for purposes of § 332(c)(7)(B)(v). The FCC was requested to clarify the time periods within which a state or locality must act on wireless facility siting applications. The petition suggested that the Commission find that there has been a failure to act if there is no final action within 45 days from the submission of a wireless facility application and within 75 days from submission of other wireless siting facility applications.

---

impediments that local governments could impose to defeat or delay the installation of wireless communications facilities such as cell phone towers, and by protecting against irrational or substanceless decisions by local authorities." (internal citations and quotation marks omitted)).

[4] *Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 57 (1st Cir. 2001) (internal quotation marks and citations omitted); *see also U.S. Cellular Corp. v. City of Wichita Falls, Tex.*, 364 F.3d 250, 253 (5th Cir. 2004) (observing that § 332(c)(7)(B) imposes substantive and procedural limits on local governments' exercise of zoning authority).

No. 10-60039

Second, CTIA asked the FCC to find that, in the event no final action was taken within the suggested 45- and 75-day time periods, the application would be deemed granted. Alternatively, CTIA proposed that the FCC establish a presumption that, if a zoning authority could not explain a failure to act within the time frames, a reviewing court should find a violation of § 332(c)(7)(B)(ii) and issue an injunction granting the underlying application.

Third, CTIA requested that the FCC interpret § 332(c)(7)(B)(i), which bars state and local governments from taking action that would "prohibit or have the effect of prohibiting the provision of personal wireless services."[5] CTIA noted that federal courts had split on the question of whether that provision prevented state and local governments from barring entry of additional wireless service providers into a given market based solely on the existence of another provider within that market.[6] CTIA suggested that the FCC declare that the existence of one or more other carriers in a given geographic market is not by itself a sufficient defense against a suit seeking to enforce § 332(c)(7)(B)(i)(II).

Fourth and finally, CTIA requested the FCC to declare that the TCA preempts any ordinance that automatically requires a wireless carrier to seek a variance, regardless of the type and location of the wireless siting proposal. As support for this request, CTIA pointed to 47 U.S.C. § 253, which provides in pertinent part: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of

---

[5] 47 U.S.C. § 332(c)(7)(B)(i)(II).

[6] *Compare, e.g.*, *Metheny v. Becker*, 352 F.3d 458, 461 n.2 (1st Cir. 2003) (observing that in the First Circuit "a provider is not precluded from obtaining relief under the Act simply because some other provider services the gap in question"), *with AT&T Wireless PCS, Inc. v. City Council of City of Va. Beach*, 155 F.3d 423, 428 (4th Cir. 1998) (concluding that the statute "only applies to 'blanket prohibitions' and 'general bans or policies,' not to individual zoning decisions").

No. 10-60039

any entity to provide any interstate or intrastate telecommunications service."[7]

The FCC issued a public notice seeking comment on CTIA's petition, and the record reflects that, in response to the notice, the FCC received dozens of comments from wireless service providers, local zoning authorities, and other interested parties. In 2009, the FCC issued the Declaratory Ruling, in which it granted in part and denied in part CTIA's petition.[8]

With respect to CTIA's request that the FCC establish time frames in which state and local governments must act on zoning requests, the FCC declared that "a reasonable period of time" for purposes of § 332(c)(7)(B)(ii) presumptively would be 90 days for personal wireless service facility siting applications requesting collocations[9] and 150 days for all other applications.[10] The FCC further determined that a lack of decision within these time frames would constitute a failure to act under § 332(c)(7)(B)(v).[11] The FCC stated, however, that personal wireless service providers and state or local governments could, by mutual consent, extend the prescribed time frames.[12] In addition, the FCC concluded that, if an applicant submits an incomplete application, the time it takes for the applicant to respond to a state or local government's request for additional information would not count toward the 90- or 150-day time frame if the state or local government notified the applicant that the application was incomplete within 30 days of receiving the application.[13]

---

[7] 47 U.S.C. § 253(a).

[8] 24 FCC Rcd. 13994 (2009).

[9] Collocations involve modifications to already existing wireless facilities.

[10] 24 FCC Rcd. 13994 ¶ 32 (2009).

[11] *Id.*

[12] *Id.* at ¶ 32.

[13] *Id.* at ¶ 53.

No. 10-60039

The FCC rejected CTIA's proposal that the FCC deem as granted applications on which final action was not taken within the prescribed time frames.[14] The FCC observed that § 332(c)(7)(B)(v)'s provision for a cause of action in a court of competent jurisdiction based on a state or local government's "failure to act" indicated Congress's "intent that courts should have the responsibility to fashion appropriate case-specific remedies."[15] Accordingly, the FCC concluded that, although the 90- and 150-day time frames established by the Declaratory Ruling were presumptively reasonable, state or local authorities would have the opportunity in any given case to rebut that presumption in court.[16]

Finally, the FCC addressed CTIA's request that the FCC interpret § 332(c)(7)(B)(i) and 47 U.S.C. § 253. With respect to § 332(c)(7)(B)(i), the FCC determined "that a State or local government that denies an application for personal wireless service facilities siting solely because 'one or more carriers serve a given geographic market' has engaged in unlawful regulation" that violates § 332(c)(7)(B)(i)(II)'s prohibition on regulation that "prohibits or ha[s] the effect of prohibiting the provision of personal wireless services."[17] With respect to § 253, the FCC rejected CTIA's request that the FCC should rely upon that provision to preempt state laws and local ordinances that require wireless service providers to obtain a variance before siting facilities.[18] The FCC noted that CTIA was not seeking the preemption of any particular ordinance and "that any further consideration of blanket variance ordinances should occur within the

---

[14] *Id.* at ¶ 39.

[15] *Id.*

[16] *Id.* at ¶ 42.

[17] *Id.* at ¶ 55.

[18] *Id.* at ¶ 67.

No. 10-60039

factual context of specific cases."[19]

Several organizations subsequently filed a petition for reconsideration, which the FCC ultimately rejected in its Reconsideration Order. After the FCC issued the Declaratory Ruling, but before it issued the Reconsideration Order, the City of Arlington filed a petition for review of the Declaratory Ruling in this court. We issued an order holding Arlington's petition for review in abeyance pending the outcome of the above-referenced petition for reconsideration. After the FCC issued the Reconsideration Order, the City of San Antonio, which had also intervened in support of Arlington's petition for review, filed its own petition seeking review of both the Declaratory Ruling and the Reconsideration Order. We have also allowed several parties to intervene in support of or in opposition to the petitions.

## II

We first address an issue involving this court's jurisdiction. As we noted above, this case involves two separate petitions for review—Arlington's petition and San Antonio's petition. Many of the issues Arlington and San Antonio raise are the same. Both cities claim (1) the FCC lacked statutory authority to establish the 90- and 150-day time frames; (2) the FCC's 90- and 150-day time frames conflict with the language of § 332(c)(7)(B)(ii) and (v); (3) the FCC's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; and (4) the FCC violated the Administrative Procedure Act (APA) because its establishment of the 90- and 150-day time frames constituted a rulemaking subject to the APA's notice-and-comment requirements.

Each city also raises issues unique to its own petition. Arlington raises a procedural due process claim. San Antonio presents two additional issues: (1) a

---

[19] *Id.*

No. 10-60039

challenge to the FCC's interpretation of § 332(c)(7)(B)(i), and (2) a claim that the FCC failed to comply with the Regulatory Flexibility Act.[20]  The FCC contends, however, that we lack jurisdiction to consider San Antonio's additional arguments because San Antonio did not timely file its petition for review.  Before we address the merits of the cities' arguments, we must address the issue of our jurisdiction.

**A**

San Antonio filed its petition for review pursuant to 47 U.S.C. § 402(a), which provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28."  Chapter 158 of Title 28 grants this court jurisdiction over "all final orders of the Federal Communications Commission made reviewable by section 402(a) of Title 47."[21]  Chapter 158 also states that a party seeking review of "a final order reviewable under this chapter" must file a petition for review of the order within 60 days after entry of the order.[22]  This 60-day period "'is jurisdictional and cannot be judicially altered or expanded.'"[23]

The FCC issued the Declaratory Ruling on November 18, 2009.  Arlington filed its petition for review of the Declaratory Ruling on January 14, 2010, within the 60-day period set forth in 28 U.S.C. § 2344.  We have jurisdiction to consider that petition and the issues Arlington raises.  San Antonio, however, did not file its petition until October 1, 2010, well beyond the expiration of the 60-day period.  Nevertheless, San Antonio argues that its petition for review of

---

[20] 5 U.S.C. § 601 *et seq*.

[21] 28 U.S.C. § 2342(1).

[22] *Id.* at § 2344.

[23] *Brazoria Cnty., Tex. v. EEOC*, 391 F.3d 685, 688 (5th Cir. 2004) (quoting *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985)).

No. 10-60039

the Declaratory Ruling is timely because it was filed within 60 days of the FCC's issuance of the Reconsideration Order.

It is the general rule that filing a petition for reconsideration with the FCC will toll the 60-day period for filing a petition for review of the agency's action in this court.[24] As the FCC notes, however, San Antonio did not file a petition for reconsideration of the Declaratory Ruling. Rather, other parties affected by the Declaratory Ruling filed the petition for reconsideration that culminated in the Reconsideration Order, and San Antonio simply submitted comments in support of that petition. The issue here, then, is whether a petition for reconsideration filed by one party to an agency action tolls § 2344's 60-day period for a party that did not file its own petition for reconsideration.

We conclude that a petition for reconsideration filed by one party does not toll § 2344's 60-day period for parties that do not file petitions for reconsideration. We reach this decision because "finality with respect to agency action is a party-based concept."[25] It is well-established that "a petition for agency reconsideration by one party does not affect the right of other parties to seek judicial review."[26] In other words, the petition for reconsideration filed in

---

[24] *See Sw. Bell Tel. Co. v. FCC*, 116 F.3d 593, 596-97 (D.C. Cir. 1997); *Bellsouth Corp. v. FCC*, 17 F.3d 1487, 1489-90 (D.C. Cir. 1994) ("[O]nce a party petitions the agency for reconsideration of an order or any part thereof, the entire order is rendered nonfinal as to that party.").

[25] *Bellsouth Corp.*, 17 F.3d at 1489 (internal quotation marks and citations omitted); *see also W. Penn Power Co. v. EPA*, 860 F.2d 581, 587 (3d Cir. 1988) ("[A]n agency action can be final for one party and nonfinal for another."); *Winter v. ICC*, 851 F.2d 1056, 1062 (8th Cir. 1988) ("[I]n multi-party proceedings one party may seek judicial review of an agency decision while another party seeks administrative reconsideration, resulting in both tribunals having jurisdiction. An agency decision may thus be final for one purpose yet nonfinal for another purpose.").

[26] *Cal. Dep't of Water Res. v. FERC*, 361 F.3d 517, 521 (9th Cir. 2004); *see also W. Penn Power Co.*, 860 F.2d at 586 ("It is well established, for example, that when two parties are adversely affected by an agency's action, one can petition for reconsideration before the agency at the same time that the other seeks judicial redetermination.").

10

this case did not affect San Antonio's right to file a petition for review in this court as of the date the FCC issued the Declaratory Ruling, and we would have been able to exercise jurisdiction over such a petition for review so long as San Antonio itself did not file a petition for reconsideration. Because "there is no principled way to distinguish between the concept of finality for purposes of triggering the running of a time limit for appeals and the concept of finality for the purpose of appellate court jurisdiction,"[27] we conclude that San Antonio's failure to petition for reconsideration of the Declaratory Ruling rendered the Declaratory Ruling a final agency decision with respect to San Antonio both for purposes of conferring jurisdiction on this court and for purposes of triggering § 2344's time period. San Antonio thus had 60 days from November 18, 2009, to file a petition for review in this court of the Declaratory Ruling. The city did not file its petition until October 1, 2010, months after its 60-day period to file a petition for review had expired, and we lack jurisdiction to consider the petition insofar as it challenges the Declaratory Ruling.

**B**

San Antonio also argues we can consider its petition, notwithstanding the fact that it was untimely with respect to the Declaratory Ruling, because the petition also challenges the FCC's Reconsideration Order. There is no doubt that San Antonio's petition for review is timely insofar as it challenges the FCC's Reconsideration Order. The Reconsideration Order is not a reviewable order, however, because it merely denied rehearing of matters decided in the Declaratory Ruling. It contained no new or additional determinations. San Antonio did not petition for reconsideration of the Declaratory Ruling, and in such a situation, San Antonio cannot challenge the rulings in the Declaratory Order by challenging only the Reconsideration Order. As the Supreme Court

---

[27] *W. Penn Power Co.*, 860 F.2d at 585-86.

No. 10-60039

explained in *ICC v. Brotherhood of Locomotive Engineers*: "where a party petitions an agency for reconsideration on the ground of 'material error,' *i.e.*, on the same record that was before the agency when it rendered its original decision, 'an order which merely denies rehearing of . . . [the prior] order is not itself reviewable.'"[28]  Here, the arguments San Antonio raises in its petition for review, and the arguments it submitted in support of the petition for reconsideration, all were originally presented to the agency during the proceedings leading up to the issuance of the Declaratory Ruling.  Accordingly, in addition to lacking jurisdiction to review San Antonio's petition insofar as it challenges the Declaratory Ruling, we also lack jurisdiction to consider the petition as a challenge to the Reconsideration Order.

## C

San Antonio maintains that we can consider all of its arguments, even if we lack jurisdiction over its petition for review, because it intervened in support of Arlington's timely petition for review in this court.  Our precedent compels us to disagree.  In *Brazoria County, Texas v. EEOC*,[29] we held that a party could not rely on her timely intervention with respect to another party's petition for review to raise matters outside the scope of the other party's petition.[30]  We arrived at this holding because motions to intervene must be filed within 30 days after filing of the petition for review[31]—which itself must be filed within 60 days after the agency's final action[32]—thus creating a situation in which intervenors can

---

[28] 482 U.S. 270, 280 (1987) (quoting *Microwave Commc'ns, Inc. v. FCC*, 515 F.2d 385, 387 n.7 (D.C. Cir. 1974)).

[29] 391 F.3d 685 (5th Cir. 2004).

[30] *Id.* at 688-89.

[31] *See* Fed. R. App. P. 15(d).

[32] 28 U.S.C. § 2344.

No. 10-60039

request review of issues as late as 90 days after the agency's final action. Because permitting an intervenor to raise additional issues for review would contravene § 2344's 60-day time period for filing petitions for review, we observed that intervenors "are bound by the issues raised in the petitions for review."[33] Thus, we generally limit intervenors to raising arguments addressing only those issues presented in the petitions for review.[34]

As discussed above, Arlington has raised five issues. San Antonio's argument that the FCC failed to comply with the Regulatory Flexibility Act and its challenge to the FCC's interpretation of § 332(c)(7)(B)(i) do not relate to those issues, and we lack jurisdiction to consider them. Accordingly, we will limit our discussion to only those issues Arlington has raised. We will, however, consider the arguments of San Antonio and other intervenors that relate to those issues.

### III

The cities contend the FCC violated the APA when it established the 90- and 150-day time frames. The APA identifies three types of agency proceedings—rulemaking, adjudication, and licensing—and prescribes specific procedures applicable to those proceedings.[35] When an agency engages in rulemaking it must, subject to certain statutory exceptions, satisfy the APA's familiar notice-and-comment requirements.[36] Adjudications, by contrast, are not

---

[33] *Brazoria Cnty., Tex.*, 391 F.3d at 689 (quoting *United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 437 (5th Cir. 1987)).

[34] *Id.  But see Kan. City S. Indus., Inc. v. ICC*, 902 F.2d 423, 434-35 (5th Cir. 1990) (exercising jurisdiction over an issue raised by an intervenor when the intervenor "filed its motion for leave to intervene in the proceedings in this Court not only within Rule 15(d)'s thirty-day filing requirement for intervention motions but also within section 2344's sixty-day filing requirement for petitions for review of ICC orders").

[35] *See Sierra Club v. Peterson*, 185 F.3d 349, 366 (5th Cir. 1999).

[36] 5 U.S.C. § 553.

subject to those requirements.[37]  The cities argue the FCC violated the APA because the time frames constitute new rules subject to the APA's notice-and-comment requirements for rulemaking and the FCC failed to comply with the those requirements.

The FCC makes two arguments in response.  First, the FCC notes the Declaratory Ruling was the product of adjudication, not rulemaking, and thus was not subject to the APA's notice-and-comment requirements.  Alternatively, the FCC suggests that any new rules included in the Declaratory Ruling were interpretive rules excepted from the notice-and-comment requirements.

## A

We first consider whether the 90- and 150-day time frames were not subject to the APA's notice-and-comment requirements because the Declaratory Ruling was the product of adjudication rather than rulemaking.  It is well-established that agencies can choose to announce new rules through adjudication rather than rulemaking.[38]  Agencies typically enjoy "very broad discretion [in deciding] whether to proceed by way of adjudication or rulemaking."[39]  The notice-and-comment requirements for rulemaking would ordinarily not apply to

---

[37] *Id.* at § 554; *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) ("There is no notice and comment requirement for an agency adjudication.").

[38] *See, e.g.*, *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (observing that an agency "is not precluded from announcing new principles in an adjudicative proceeding"); *Mobil Exploration & Producing N. Am., Inc. v. FERC*, 881 F.2d 193, 198 (5th Cir. 1989) (stating that an agency "may establish rules of general application in either a statutory rulemaking procedure or an individual adjudication").

[39] *Time Warner Entm't Co., L.P. v. FCC*, 240 F.3d 1126, 1141 (D.C. Cir. 2001); *see also Bell Aerospace Co.*, 416 U.S. at 294 (observing that "the choice between rulemaking and adjudication lies in the first instance within the Board's discretion"); *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."); *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000) ("Agencies have discretion to choose between adjudication and rulemaking as a means of setting policy.").

the FCC's decision to establish the time frames if the FCC exercised its discretion to issue the Declaratory Ruling pursuant to its adjudicative powers.

We examine two aspects of an agency action when determining whether an agency action was a rulemaking or an adjudication. First, we consider the agency's characterization of its own action.[40] Second, we must examine the ultimate product of the agency action.[41] Both of these considerations lead us to agree with the FCC that the Declaratory Ruling was the result of an adjudication and not a rulemaking.

First, the FCC itself claims it was engaging in adjudication when it issued the Declaratory Ruling. As we have previously recognized, we "accord significant deference to an agency's characterization of its own action."[42] This deference is not absolute, however. Otherwise, an agency would be able to escape the APA's notice-and-comment requirements simply by labeling a rulemaking an adjudication.[43] Whether the FCC's action here constituted an adjudication or a rulemaking ultimately turns on the attributes of the Declaratory Ruling itself.

The Declaratory Ruling is designated as a "Declaratory Ruling," and it was issued pursuant to 47 C.F.R. § 1.2. Section 1.2 grants the FCC the power to issue declaratory orders and is derivative of § 554(e) of the APA.[44] Section 554(e)

---

[40] *Am. Airlines, Inc.*, 202 F.3d at 797.

[41] *Id.*

[42] *Id.*

[43] *Cf. Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation.").

[44] 47 C.F.R. § 1.2(a) ("The Commission may, in accordance with section 5(d) of the Administrative Procedure Act, on motion or on its own motion issue a declaratory ruling terminating a controversy or removing uncertainty."); *see also Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 397 n.4 (9th Cir. 1996) ("Because 5 U.S.C. § 554(e) grants the FCC authority to issue

15

provides: "The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." Because § 554(e) is a subsection of the provision in the APA governing formal adjudication, we have held that declaratory rulings issued pursuant to its grant of authority are informal adjudications under the APA.[45] We see no reason to treat the Declaratory Ruling differently: it was the product of adjudication.[46]

## B

Our conclusion that the Declaratory Ruling resulted from adjudication does not end our review of the FCC's purported non-compliance with the APA. Although, as noted above, agencies enjoy broad discretion in choosing whether to establish a rule through adjudication or rulemaking,[47] that discretion is not unlimited. The agency ultimately remains subject to the constraints of the APA, which requires courts to review the agency's action to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[48] The Ninth Circuit, for example, has identified certain situations in which

---

'declaratory orders,' and because 47 C.F.R. § 1.2 is derived from § 554(e), it appears that the terms 'declaratory order' and 'declaratory ruling' are used interchangeably.").

[45] *See Am. Airlines, Inc.*, 202 F.3d at 796-98 (treating a declaratory order issued pursuant to § 554(e) as an informal adjudication); *Texas v. United States*, 866 F.2d 1546, 1555 (5th Cir. 1989) (same); *see also Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007) ("[T]here is no question that a declaratory ruling can be a form of adjudication." (internal citation omitted)).

[46] *See Am. Airlines, Inc.*, 202 F.3d at 798; *Radiofone, Inc. v. FCC*, 759 F.2d 936, 939 (D.C. Cir. 1985) ("There is no doubt that the Commission's action in this case was an adjudication and not a rulemaking. It is captioned 'Declaratory Ruling,' a category of action which, according to the Commission's rules, is taken 'in accordance with section 5(d) of the Administrative Procedure Act,' 47 C.F.R. § 1.2 (1984). That subsection, now codified at 5 U.S.C. § 554(e) (1982), pertains to adjudication." (internal footnote omitted)).

[47] *Am. Airlines, Inc.*, 202 F.3d at 797.

[48] 5 U.S.C. § 706(2)(A).

an agency's reliance on adjudication instead of rulemaking constitutes an abuse of discretion.[49] Even though we conclude the Declaratory Ruling was the product of an adjudication, we will consider whether the FCC abused its discretion or otherwise violated the law by promulgating the 90- and 150-day time frames through adjudication rather than rulemaking.[50] On this point, we harbor serious doubts as to the propriety of the FCC's choice of procedures.

Specifically, we note that the Declaratory Ruling's 90- and 150-day time frames bear all the hallmarks of products of rulemaking, not adjudication. Adjudications typically "resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals."[51] In *American Airlines, Inc. v. Department of Transportation*, we held that the Department of Transportation properly used § 554(e)'s declaratory ruling mechanism to resolve a dispute involving the application of the federal law governing airline service at Love Field airport.[52] In that case we specifically observed that "because DOT's order interpreted the rights of a small number of parties properly before it, DOT did not abuse its discretion by acting through an

---

[49] *See MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1151 (9th Cir. 2008) ("An agency adjudication may require a notice and comment period if it constitutes de facto rulemaking that affects the rights of broad classes of unspecified individuals." (internal quotation marks and citations omitted)); *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 950 (9th Cir. 2007) ("Of course, in certain circumstances an agency may abuse its discretion by announcing new rules through adjudication rather than through rulemaking, such as when the rule operates retroactively and disturbs settled expectations.").

[50] *See Am. Airlines, Inc.*, 202 F.3d at 798 (reviewing agency's decision to proceed by adjudication rather than rulemaking for abuse of discretion); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) ("[T]here may be situations where [an agency's] reliance on adjudication would amount to an abuse of discretion . . . .").

[51] *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994); *see also Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1187-88 (9th Cir. 2010) (per curiam); *San Juan Cable LLC v. P.R. Tel. Co., Inc.*, 612 F.3d 25, 33 n.3 (1st Cir. 2010).

[52] 202 F.3d at 797-98.

adjudicatory proceeding."[53]

Similarly, in *Mobil Exploration & Producing North America, Inc. v. FERC*,[54] we reviewed an agency's decision to institute a new one-year time limit for successors in interest in gas-producing properties to obtain a new certificate of public convenience and necessity.[55] The agency instituted the new limit in the course of reviewing a particular successor's application for a certificate.[56] Petitioners challenged the limit on a number of grounds, including that the limit should have been instituted using the formal rulemaking procedure in the APA, and we held that the agency did not abuse its discretion in choosing to establish the limit through adjudication rather than rulemaking.[57]  In doing so, we specifically noted that the new time limit was "a relatively minor procedural requirement with limited effect" due to the fact that there were "fewer than 250 large producers that would be subject to the one-year successor filing requirement."[58] Here, the FCC established the 90- and 150-day time frames, not in the course of deciding any specific dispute between a wireless provider and a state or local government, but in a proceeding focused exclusively on providing an interpretation of § 332(c)(7)(B) that would apply prospectively to every state and local government in the United States.

It is true that an agency need not be presented with a specific dispute between two parties in order to use § 554(e)'s declaratory ruling mechanism, because § 554 does not limit an agency's use of declaratory rulings to

---

[53] *Id.* at 798.

[54] 881 F.2d 193 (5th Cir. 1989).

[55] *Id.* at 195-96.

[56] *Id.* at 196.

[57] *Id.* at 198-99.

[58] *Id.* at 199.

terminating controversies between parties. Section 554 also empowers agencies to use declaratory rulings to "remove uncertainty," and there are cases suggesting an agency may use a declaratory ruling to issue interpretations of law that are both general and prospective in their application and divorced from a specific dispute between parties. In *Qwest Services Corp. v. FCC*,[59] the District of Columbia Circuit upheld the FCC's use of a declaratory ruling to announce that certain types of prepaid calling cards were telecommunications services and that their providers were subject to regulation under the TCA.[60] In *Chisholm v. FCC*,[61] the District of Columbia Circuit similarly upheld the FCC's use of a declaratory ruling to determine the application of the Communication Act's equal-time provision to specific types of appearances by political candidates.[62] Nevertheless, even these cases involved concrete and narrow questions of law the resolutions of which would have an immediate and determinable impact on specific factual scenarios. Here, by contrast, the FCC has provided guidance on the meaning of § 332(c)(7)(B)(ii) and (v) that is utterly divorced from any specific application of the statute. The time frames' effect with respect to any particular dispute arising under § 332(c)(7)(B)(ii) will only become clear after adjudication of the dispute in a court of competent jurisdiction. This is classic rulemaking.[63]

Nevertheless, we need not decide whether the FCC abused its discretion by failing to use notice-and-comment rulemaking to establish the time frames. We also do not address the FCC's argument that, even if it did engage in

---

[59] 509 F.3d 531 (D.C. Cir. 2007).

[60] *Id.* at 536-37.

[61] 538 F.2d 349 (D.C. Cir. 1976).

[62] *Id.* at 364-66.

[63] *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("Rulemaking, in contrast, is prospective, and has a definitive effect on individuals only after the rule subsequently is applied.").

rulemaking, the rulemaking was interpretative rulemaking of the type excepted from the APA's notice-and-comment requirements.[64] We need not decide these questions because any failure by the FCC to comply with the APA in this case was harmless.[65]

"[T]he harmless error rule requires the party asserting error to demonstrate prejudice from the error."[66] An agency's failure to comply with the APA is harmless when the agency's mistake "clearly had no bearing on the procedure used or the substance of decision reached."[67] In conducting the harmless error inquiry, we inform our analysis with a number of potentially relevant factors, including (1) "an estimation of the likelihood that the result would have been different"; (2) "an awareness of what body (jury, lower court, administrative agency) has the authority to reach that result"; (3) "a consideration of the error's likely effects on the perceived fairness, integrity, or public reputation of judicial proceedings"; and (4) "a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference."[68]

---

[64] 5 U.S.C. § 553(d)(2).

[65] *See United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) ("The APA demands that courts reviewing agency decisions under the Act '[take] due account . . . of the rule of prejudicial error.'" (alteration in original) (quoting 5 U.S.C. § 706)); *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("The harmless error rule applies to agency action because '[i]f the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.'" (alteration in original) (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004)).

[66] *Air Can. v. Dep't of Transp.*, 148 F.3d 1142, 1156 (D.C. Cir. 1998); *see also Shinseki v. Sanders*, 129 S. Ct. 1696, 1706 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

[67] *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (quoting *Braniff Airways v. Civil Aeronautics Bd.*, 379 F.3d 453, 466 (D.C. Cir.1967)) (internal quotation marks omitted).

[68] *Shinseki*, 129 S. Ct. at 1707; *see also Johnson*, 632 F.3d at 930.

No. 10-60039

The APA's notice-and-comment procedures are familiar:

> Under the APA, agencies issuing rules must publish notice of proposed rulemaking in the *Federal Register* and shall give interested persons an opportunity to participate in the rule making by allowing submission of comments. In addition, the APA requires that publication of a substantive rule shall be made not less than 30 days before its effective date.[69]

When an agency fails to comply with the APA's notice and comment procedures, the touchstone is "whether it is clear that the lack of notice and comment did not prejudice the petitioner."[70] In this case, there is no indication that any failure of the FCC to comply with the APA's notice-and-comment procedures prejudiced Arlington or the intervenors.

As an initial matter, the FCC published notice of CTIA's petition in the *Federal Register*, and the notice requested comments on CTIA's request that the FCC "clarify the time period in which a state or local zoning authority will be deemed to have failed to act on a wireless facility siting application."[71] The notice also referenced CTIA's requests that the FCC establish specific time frames and implement a system under which an application would be deemed granted if a zoning authority failed to act within the applicable time frame.[72] It is true that the FCC labeled its published notice as a request for comment on a "Petition for Declaratory Ruling" rather than as a "Notice of Proposed Rulemaking," but, as the District of Columbia Circuit has repeatedly held, such a deficiency is not fatal because "'to remand solely because the Commission

---

[69] *Johnson*, 632 F.3d at 927 (internal quotation marks and citations omitted); *see also* 5 U.S.C. § 553(b)-(d).

[70] *Johnson*, 632 F.3d at 931.

[71] *See* Wireless Telecommunications Bureau seeks Comment on Petition for Declaratory Ruling by CTIA, 73 Fed. Reg. 50972, 50972 (Aug. 29, 2008).

[72] *Id.* at 50972-73.

labeled the action a declaratory ruling would be to engage in an empty formality.'"[73]

We also cannot ignore the fact that, after publishing the notice in the *Federal Register*, the FCC received and considered comments from dozens of interested parties, including several of the cities involved in this litigation. Many of those comments raised the very issues now raised before this court, and the FCC addressed those issues in its Declaratory Ruling. Indeed, we are not aware of a single argument the cities now present to this court that was not considered by the FCC in the agency proceedings below. These facts call to mind our recent observations in *United States v. Johnson*:

> The purpose of notice-and-comment rulemaking is to assure fairness and mature consideration of rules having a substantial impact on those regulated. The process allows the agency to educate itself before adopting a final order. In addition, public notice requires the agency to disclose its thinking on matters that will affect regulated parties. These goals, however, may be achieved in cases where the agency's decision-making process centered on the identical substantive claims as those proposed by the party asserting error, even if there were APA deficiencies. It follows that when a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced.[74]

Finally, to the extent the FCC might have failed to comply with the APA's 30-day waiting period before an adopted rule becomes effective, the cities have suggested no reason why any such waiting period was needed in this case or demonstrated any prejudice resulting from the FCC's failure to delay the effective date of the Declaratory Ruling. We note that "the purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their

---

[73] *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 40 (D.C. Cir. 2005) (quoting *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 815 (D.C. Cir. 1984)).

[74] *Johnson*, 632 F.3d at 931 (internal quotation marks, brackets, and citations omitted).

behavior before the final rule takes effect."[75]  On this point, the Declaratory Ruling itself recognized the need "to give State and local governments an additional period to review currently pending applications before an applicant might file suit."[76]  The FCC determined that, for all zoning applications that had been pending for less than 90 days (with respect to collocation applications) or 150 days (with respect to all other applications) at the time of the issuance of the Declaratory Ruling, state or local governments would have an additional 90- or 150-day period before their inaction would be presumed unreasonable under the time frames.[77]  For those applications that had been pending for longer than the applicable time frame at the time of the Declaratory Ruling, the FCC determined state or local governments would have 60 days from the provision of notice by the applicant before the applicant would be able to seek judicial relief.[78]  The cities have not demonstrated that the FCC's approach here burdened them in any way.  Nor have they pointed to zoning applications they were forced to address earlier due to the FCC's failure to comply with the 30-day waiting period.

We conclude that any error in the FCC's choice to establish the time frames in the Declaratory Ruling instead of through notice-and-comment rulemaking was plainly harmless.  The cities received notice of the issues pending before the FCC and had the ability to comment on CTIA's petition in the agency proceedings.  More than sixty cities, towns, and villages, and scores of other governmental entities or their representatives submitted comments in response to the FCC's notice.  The FCC considered and addressed all of the

---

[75] *Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996).

[76] 24 FCC Rcd. 13994 ¶ 51 (2009).

[77] *Id.*

[78] *Id.*

substantive issues the cities now raise. Any deficiencies in the procedures leading to the Declaratory Ruling do not justify vacating and remanding the order.

## IV

The cities also argue the FCC violated due process when it issued the Declaratory Ruling. The cities base this argument on their assertion that the FCC failed to comply with 47 C.F.R. § 1.1206(a) when it considered CTIA's petition. A note to that regulation provides:

> In the case of petitions for declaratory ruling that seek Commission preemption of state or local regulatory authority and petitions for relief under 47 U.S.C. 332(c)(7)(B)(v), the petitioner must serve the original petition on any state or local government, the actions of which are specifically cited as a basis for requesting preemption. Service should be made on those bodies within the state or local governments that are legally authorized to accept service of legal documents in a civil context. Such pleadings that are not served will be dismissed without consideration as a defective pleading and treated as a violation of the ex parte rules unless the Commission determines that the matter should be entertained by making it part of the record under § 1.1212(d) and the parties are so informed.[79]

The cities claim CTIA did not serve its petition on the state and local governments whose delays served as the impetus for CTIA's petition. According to the cities, CTIA's failure to serve the petition necessitated its dismissal and the FCC's failure to do so resulted in a denial of due process.

The FCC responds that its decision not to dismiss CTIA's petition was justified by its own interpretation of § 1.1206(a). In the Declaratory Ruling, the FCC concluded: "By its terms, the service requirement does not apply to a petition that cites examples of the practices of unidentified jurisdictions to demonstrate the need for a declaratory ruling interpreting provisions of the

---

[79] 47 C.F.R. § 1.1206(a) note 1.

Communications Act."[80]  The FCC notes that CTIA's petition did not identify specific municipalities and that nothing in its rules required the petition to do so.

Reduced to its essence, the cities' claim is that the FCC violated due process by failing to ensure that CTIA's petition was served on the specific state and local governments whose delays caused CTIA to petition the FCC for the Declaratory Ruling.  We do not believe that due process required such individual service in this case because the FCC, in issuing the Declaratory Ruling, was not adjudicating the legality of the actions of those state and local governments.  The FCC was not confronted with a concrete dispute the resolution of which would have an immediate effect on specific individuals.[81]  As noted above, in this sense the Declaratory Ruling was more akin to a rulemaking than the typical adjudication, and we have observed that "[w]hen a rule is established through statutory rulemaking, public notice and hearing provide the necessary protection. . . .  Such notice is provided by publication of the proposed rulemaking in the Federal Register, and all parties who will be affected by the rule are given an opportunity to challenge [the agency's] action."[82]  Here, the FCC provided notice of CTIA's petition in the *Federal Register* and allowed all interested parties to provide comments on CTIA's petition.  Under the circumstances of this case, those procedures were adequate to satisfy due process.

[80] 24 FCC Rcd. 13994 ¶ 68 (2009).

[81] *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) ("[B]ecause adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute).").

[82] *Mobil Exploration & Producing N. Am., Inc. v. FERC*, 881 F.2d 193, 199 (5th Cir. 1989); *see also Fla. Gas Transmission Co. v. FERC*, 876 F.2d 42, 44 (5th Cir. 1989).

No. 10-60039

## V

Regarding the determinations in the FCC's Declaratory Ruling, we begin with the cities' suggestion that the FCC lacked the statutory authority to adopt the 90- and 150-day time frames. As noted above, those time frames represent the FCC's construction of language in § 332(c)(7)(B)(ii) and (v). The cities argue, however, that § 332(c)(7)(A) precludes the FCC from exercising authority to implement that language. The cities also note that § 332(c)(7)(B)(v) places jurisdiction over disputes arising under § 332(c)(7)(B)(ii) in the courts and suggests that this jurisdictional provision supports its proposed reading of § 332(c)(7)(A).

The FCC, on the other hand, contends that it possessed statutory authority to adopt the 90- and 150-day time frames pursuant to its general authority to make such rules and regulations as may be necessary to carry out the Communication Act's provisions.[83] The FCC argues that § 332(c)(7)(A) does not bar the FCC from exercising this authority because the FCC interprets § 332(c)(7)(A) as merely precluding the FCC from imposing additional limitations on state and local government authority over the wireless facility zoning process beyond those already provided for in § 332(c)(7)(B). Under the FCC's interpretation, the FCC retains the authority to implement the limitations already set forth in § 332(c)(7)(B).

## A

We ordinarily review an agency's interpretation of the statutes it is charged with administering using the *Chevron* two-step standard of review.[84] Under *Chevron*, we first ask "whether Congress has directly addressed the

---

[83] *See, e.g.*, 47 U.S.C. §§ 151, 154(i), 201(b), 303(r).

[84] *See Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 796 (5th Cir. 2000).

precise question at issue."[85]  If Congress has addressed the question, "we must give effect to the unambiguously expressed intent of Congress."[86]  If we determine that the statute is silent or ambiguous with respect to the precise question at issue, however, we then "consider whether the agency's answer is based on a permissible construction of the statute."[87]  "As long as the agency's construction of an ambiguous statute is permissible, it must be upheld."[88]  Although we engage in the *Chevron* analysis when reviewing an agency's interpretation of a statute it is charged with administering, we do not use *Chevron* when reviewing an agency's interpretation of a statute it is not charged with administering.[89]

The issue in the instant case is whether the FCC possessed statutory authority to administer § 332(c)(7)(B)(ii) and (v) by adopting the 90- and 150-day time frames.  Although it is clear that *Chevron* review does not apply once it is determined that an agency lacks authority to interpret a statute, the parties dispute whether *Chevron* review should apply when we determine the extent of the agency's jurisdiction.  The FCC argues that an agency's interpretation of its own statutory authority is subject to review under *Chevron*.  The cities, on the other hand, argue the issue presents "a pre-*Chevron* question of law regarding the scope of the FCC's authority" and that such a question of law is subject to de

---

[85] *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984)) (internal quotation marks omitted).

[86] *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 393 (5th Cir. 2008) (quoting *Chevron*, 476 U.S. at 843) (internal quotation marks omitted).

[87] *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 749 (5th Cir. 2011) (quoting *Chevron*, 476 U.S. at 483) (internal quotation marks omitted).

[88] *Am. Airlines, Inc.*, 202 F.3d at 796.

[89] *Id.*

novo review.

The Supreme Court has not yet conclusively resolved the question of whether *Chevron* applies in the context of an agency's determination of its own statutory jurisdiction,[90] and the circuit courts of appeals have adopted different approaches to the issue. Some circuits apply *Chevron* deference to disputes over the scope of an agency's jurisdiction,[91] some do not,[92] and some circuits have thus far avoided taking a position.[93] In this circuit, we apply *Chevron* to an agency's interpretation of its own statutory jurisdiction, and therefore, we will apply the *Chevron* framework when determining whether the FCC possessed the statutory authority to establish the 90- and 150-day time frames.[94]

---

[90] *See Pruidze v. Holder*, 632 F.3d 234, 237 (6th Cir. 2011) (collecting cases and observing that the Supreme Court has yet to resolve the debate over whether *Chevron* applies to disputes about the scope of an agency's jurisdiction).

[91] *See, e.g.*, *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1145-46 (10th Cir. 2010) (en banc) ("Of course, courts afford considerable deference to agencies interpreting ambiguities in statutes that Congress has delegated to their care, . . . including statutory ambiguities affecting the agency's jurisdiction . . . ." (internal citations omitted)); *P.R. Mar. Shipping Auth. v. Valley Freight Sys., Inc.*, 856 F.2d 546, 552 (3d Cir. 1988) ("When Congress has not directly and unambiguously addressed the precise question at issue, a court must accept the interpretation set forth by the agency so long as it is a reasonable one. . . . This rule of deference is fully applicable to an agency's interpretation of its own jurisdiction." (internal citation omitted)).

[92] *See, e.g.*, *N. Ill. Steel Supply Co. v. Sec'y of Labor*, 294 F.3d 844, 846-47 (7th Cir. 2002) (concluding that de novo review is appropriate for questions involving an agency's determination of its own jurisdiction); *Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998) (reviewing agency's legal conclusion regarding the scope of its own jurisdiction without deference to the agency's determination).

[93] *See Pruidze*, 632 F.3d at 237 (leaving the question unanswered); *O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996) (same).

[94] *Texas v. United States*, 497 F.3d 491, 501 (5th Cir. 2007) (observing that *Chevron* step one applies to "challenges to an agency's interpretation of a statute, as well as whether the statute confers agency jurisdiction over an issue"); *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 440-46 (5th Cir. 1999) (applying *Chevron* to a question concerning the scope of the FCC's statutory authority to provide universal service support for schools, libraries, and rural health-care providers); *First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895, 901 (5th Cir. 1995) (per curiam) ("[T]his circuit has accorded deference to an agency's determination of its own

No. 10-60039

## B

"At the first step of a *Chevron* analysis, we must determine whether Congress has directly spoken in a manner that reveals its expressed intent."[95] "We use the traditional tools of statutory construction to determine whether Congress has spoken to the precise point at issue,"[96] and "[t]here is no better or more authoritative expression of congressional intent than the statutory text."[97] We determine the plainness or ambiguity of the statutory text by referencing "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."[98] "'[W]here the statutory language is unambiguous and the statutory scheme is coherent and consistent,' the language of the statute is usually where we end."[99] If the statutory language is susceptible to more than one reasonable interpretation, however, it is ambiguous and we must proceed to *Chevron* step two.[100]

As noted above, the FCC argues that its general authority to make rules and regulations to carry out the Communications Act includes the power to implement § 332(c)(7)(B)(ii) and (v). One express grant is found at 47 U.S.C.

statutory authority.").

[95] *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 394 (5th Cir. 2008) (quoting *Chevron*, 476 U.S. at 843) (internal quotation marks omitted).

[96] *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 749 (5th Cir. 2011) (citing *Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Bd.*, 201 F.3d 551, 554 (5th Cir. 2000)).

[97] *Med. Ctr. Pharm.*, 536 F.3d at 394.

[98] *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

[99] *Med. Ctr. Pharm.*, 536 F.3d at 394 (quoting *Robinson*, 519 U.S. at 340).

[100] *See United States v. Hoang*, 636 F.3d 677, 682 (5th Cir. 2011) ("It is familiar learning that '[a] statute is ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning.'" (quoting *In re Condor Ins. Ltd.*, 601 F.3d 319, 321 (5th Cir. 2010)); *Comacho v. Tex. Workforce Comm'n*, 408 F.3d 229, 234 (5th Cir. 2005) ("Generally, a statute is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'" (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001)).

29

No. 10-60039

§ 201(b), which provides that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." The Supreme Court has held the FCC's rulemaking authority under § 201(b) extends to provisions added by the TCA because Congress passed the TCA as an amendment to the Communications Act.[101] Congress retains the ability to restrict its grant of power to an agency, though, and the cities argue Congress included language in the TCA precluding the FCC from using the Communication Act's grant of general authority to implement § 332(c)(7)(B)'s limitations.[102] The cities point to § 332(c)(7)(A), which provides: "Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." The cities also claim that § 332(c)(7)(B)(v)'s vesting of jurisdiction in the courts to review disputes arising under § 332(c)(7)(B)(ii) evinces Congress's intent to remove jurisdiction over § 332(c)(7)(B)(ii) from the FCC.

The question we confront under *Chevron* is whether these provisions unambiguously indicate Congress's intent to preclude the FCC from implementing § 332(c)(7)(B)(ii) and (v). If they do, the FCC lacked statutory authority to issue the 90- and 150-day time frames. If the provisions are ambiguous, however, we must defer to the FCC's interpretation—an interpretation under which the FCC possessed authority to issue the 90- and

---

[101] *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999) ("We think that the grant in § 201(b) means what it says: The FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252, added by the Telecommunications Act of 1996."); *see also AT&T Commc'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 641 (5th Cir. 2001).

[102] *Cf. First Gibraltar Bank, FSB v. Morales*, 42 F.3d 895, 901 (5th Cir. 1995) (per curiam) ("As part of its legislative powers, Congress designates the scope of agency authority, and if Congress so chooses, it can subsequently restrict or limit that delegation of power to the agency.").

No. 10-60039

150-day time frames—so long as the FCC's interpretation represents a reasonable construction of their terms. For the following reasons, we conclude neither § 332(c)(7)(A) nor § 332(c)(7)(B)(v) unambiguously preclude the FCC from establishing the 90- and 150-day time frames.

First, we note that § 332(c)(7)(A), when it states "[e]xcept as provided in this paragraph," removes § 332(c)(7)(B)'s limitations from its reach and recognizes those limitations as legitimate intrusions into state and local governments' traditional authority over zoning decisions. The fundamental question then, is whether § 332(c)(7)(A), in restricting the TCA's limitations on state or local zoning authority to only those contained in § 332(c)(7)(B), also precludes the FCC from implementing those limitations by relying on its general rulemaking authority under the Communications Act. This is a question to which § 332(c)(7)(A) itself does not provide a clear answer. Section 332(c)(7)(A) states Congress's desire to make § 332(c)(7)(B)'s limitations the only limitations confronting state and local governments in the exercise of their zoning authority over the placement of wireless services facilities, and thus certainly prohibits the FCC from imposing restrictions or limitations that cannot be tied to the language of § 332(c)(7)(B). Whether the FCC retains the power of implementing those limitations, however, remains unresolved.

Congress's silence on this point is not without implication. Had Congress intended to insulate § 332(c)(7)(B)'s limitations from the FCC's jurisdiction, one would expect it to have done so explicitly because Congress surely recognized that it was legislating against the background of the Communications Act's general grant of rulemaking authority to the FCC. The FCC's general grant of authority would ordinarily extend to amendments to the Communications Act, like § 332(c)(7)(B)'s limitations, in the absence of specific statutory limitations

31

on that authority,[103] and Congress certainly knew how to specifically restrict the FCC's general authority over the Communications Act as it clearly restricted the FCC's ability to use that authority in other contexts.[104] Here, however, Congress did not clearly remove the FCC's ability to implement the limitations set forth in § 332(c)(7)(B), and this Congressional silence leaves § 332(c)(7)(A)'s effect on the FCC's authority to administer § 332(c)(7)(B)'s limitations ambiguous.

Moreover, the cities' reliance on § 332(c)(7)(B)(v) does not resolve § 332(c)(7)(A)'s ambiguity. The cities contend that, by establishing jurisdiction in the courts over specific disputes arising under § 332(c)(7)(B)(ii), Congress indicated its intent to remove that provision from the scope of the FCC's general authority to administer the Communications Act. The cities read too much into § 332(c)(7)(B)(v)'s terms, however. Although § 332(c)(7)(B)(v) does clearly establish jurisdiction in the courts over disputes arising under § 332(c)(7)(B)(ii), the provision does not address the FCC's power to administer § 332(c)(7)(B)(ii) in contexts other than those involving a specific dispute between a state or local government and persons affected by the government's failure to act. Accordingly, one could read § 332(c)(7) as a whole as establishing a framework in which a wireless service provider must seek a remedy for a state or local government's unreasonable delay in ruling on a wireless siting application in a court of competent jurisdiction while simultaneously allowing the FCC to issue an interpretation of § 332(c)(7)(B)(ii) that would guide courts' determinations of disputes under that provision.

The Sixth Circuit recently addressed a similar statutory scheme in

---

[103] *See AT&T Corp.*, 525 U.S. at 378.

[104] *See, e.g.*, 47 U.S.C. § 152(b) (listing specific exceptions to the FCC's authority over the Communications Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369-76 (1986) (holding § 152(b) "denies the FCC the power to preempt state regulation of depreciation for intrastate ratemaking purposes").

No. 10-60039

*Alliance for Community Media v. FCC*.[105]  That decision involved provisions of the Communications Act that delegated to municipalities, in the form of local franchising authorities (LFAs), the power to award cable franchises.[106]  The provisions at issue further provided that an LFA could not "unreasonably refuse to award an additional competitive franchise,"[107] and "endowed potential entrants with a judicial remedy by entitling them to commence an action in a federal or state court within 120 days after receiving a final, adverse decision from an LFA."[108]  After the FCC promulgated rules delineating situations that would constitute an unreasonable refusal to award a cable franchise, petitioners claimed (among other arguments) that the statute's identification of courts as the forum for aggrieved cable operators to obtain relief deprived the FCC of statutory authority to exercise its rulemaking power.  The court rejected that argument, holding that "the availability of a judicial remedy for unreasonable denials of competitive franchise applications does not foreclose the agency's rulemaking authority over section 621(a)(1)."[109]  The decision in *Alliance for Community Media* supports the conclusion that there is nothing inherently unreasonable about reading § 332(c)(7) as preserving the FCC's ability to implement § 332(c)(7)(B)(ii) while providing for judicial review of disputes under § 332(c)(7)(B)(ii) in the courts.[110]  Section 332(c)(7)(B)(v)'s vesting in the courts

---

[105] 529 F.3d 763 (6th Cir. 2008).

[106] *Id.* at 768.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 775.

[110] *Id.* at 776 ("[W]e believe that courts can grant deference to the Order while maintaining their Congressionally-granted authority to make factual determinations and provide relief to aggrieved cable operators."). *Cf. AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 385 (1999) ("While it is true that the 1996 Act entrusts state commissions with the job of

of jurisdiction over disputes arising under § 332(c)(7)(B)(ii) thus does not unambiguously preclude the FCC from taking the action at issue in this case.

In sum, we conclude that § 332(c)(7) is ambiguous with respect to the FCC's authority to establish the 90- and 150-day time frames. Although the statute clearly bars the FCC from using its general rulemaking powers under the Communications Act to create additional limitations on state and local governments beyond those the statute provides in § 332(c)(7)(B), the statute is silent on the question of whether the FCC can use its general authority under the Communications Act to implement § 332(c)(7)(B)'s limitations. We proceed to *Chevron* step two.

## C

Once we determine that a statute is silent or ambiguous with respect to a question at issue, we must defer to the agency's resolution of the question if the agency's interpretation is based on a permissible construction of the statute.[111] In addition to arguing that the plain text of § 332(c)(7) precludes the FCC from establishing the 90- and 150-day time frames, the cities make a number of other arguments that seemingly attack the permissibility of any construction of the statute that would allow the FCC to exercise the power that it did in this case. First, the cities claim § 332(c)(7)'s legislative history supports their proposed reading of § 332(c)(7) and not the FCC's. Second, they suggest that a construction of § 332(c)(7) that would grant the FCC authority to implement § 332(c)(7)(B)'s limitations on state and local government would conflict with the principle that "if Congress intends to preempt a power

---

approving interconnection agreements and granting exemptions to rural LECs, these assignments . . . do not logically preclude the [FCC's] issuance of rules to guide the state-commission judgments." (internal citations omitted)).

[111] *See, e.g.*, *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984)).

No. 10-60039

traditionally exercised by a state or local government, it must make its intention to do so unmistakably clear in the language of the statute."[112]  Finally, they suggest the FCC itself had long recognized that it lacked jurisdiction with respect to § 332(c)(7)(B)'s limitations.  These arguments are not persuasive.

Regarding the legislative history surrounding the passage of § 332(c)(7), the cities note Congress considered but ultimately did not enact a version of the statute that directed the FCC to "prescribe and make effective a policy regarding State and local regulation of the placement, construction, modification, or operation of facilities for the provision of commercial mobile services."[113]  The cities also point to the Conference Report from the passage of the TCA, which provides in pertinent part:

> The conference agreement creates a new section 704 which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement.  The conference agreement also provides a mechanism for judicial relief from zoning decisions that fail to comply with the provisions of this section. It is the intent of the conferees that other than under section 332(c)(7)(B)(iv) of the Communications Act of 1934 as amended by this Act and section 704 of the Telecommunications Act of 1996 the courts shall have exclusive jurisdiction over all other disputes arising under this section.  Any pending Commission rulemaking concerning the preemption of local zoning authority over the placement, construction or modification of CMS facilities should be terminated.[114]

The cities argue the FCC's construction of § 332(c)(7) contravenes this legislative history.  The implication, then, is that this legislative history clarifies any

---

[112] *City of Dallas, Tex. v. FCC*, 165 F.3d 341, 347-48 (5th Cir. 1999) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)) (internal quotation marks and citations omitted).

[113] H.R. REP. NO. 104-204, pt. 1, at 25 (1995).

[114] H.R. REP. NO. 104-458, at 207-08 (1996) (Conf. Rep.).

ambiguity in § 332(c)(7)'s plain text and indicates Congress's intent to remove from the FCC the authority to implement § 332(c)(7)(B)(ii) and (v).

This argument fails, however, because the legislative history itself is ambiguous. Although the legislative history surrounding the passage of § 332(c)(7) indicates Congress intended the provision to remove from the FCC the authority to make new rules limiting or affecting state and local government authority over wireless zoning decisions, the legislative history, like the statute itself, is silent as to the FCC's ability to use its general rulemaking power to provide guidance with respect to the limitations § 332(c)(7)(B) expressly imposes on state and local governments. In other words, the legislative history does no more than indicate Congress's intent to bar the FCC from imposing additional limitations on state and local government authority. It does not indicate a clear intent to bar FCC implementation of the limitations already expressly provided for in the statute. Under these circumstances, we cannot conclude that the legislative history "is so clear and compelling . . . that it leaves no doubt as to Congress's intent."[115]

The cities also suggest that interpreting § 332(c)(7) in a way that would allow the FCC to implement § 332(c)(7)(B)(ii) and (v) conflicts with the principle that "if Congress intends to preempt a power traditionally exercised by a state or local government, it must make its intention to do so unmistakably clear in the language of the statute."[116] The cities assert that the FCC's new 90- and 150-day time frames displace state laws establishing different time frames.

The cities' argument is unconvincing because those state laws are already preempted, at least to the extent that the state time limits violate § 332(c)(7)(B)(ii)'s requirement that state and local authorities rule on zoning

---

[115] *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 396 (5th Cir. 2008).

[116] *City of Dallas, Tex.*, 165 F.3d at 347-48 (quoting *Gregory*, 501 U.S. at 460) (internal quotation marks and citations omitted).

requests in a reasonable amount of time. That section already acts to preempt these state laws by creating a federal time frame defined through reference to reasonableness. No one could plausibly argue, for example, that if a state passed a law stating that local governments had ten years to rule on such applications, § 332(c)(7)(B)(ii) would not have the effect of preempting that law insofar as an aggrieved party would likely be able to petition a court for relief under § 332(c)(7)(B)(v) well before the expiration of the state's time frame. FCC action interpreting what amount of time is "reasonable" under § 332(c)(7)(B)(ii) only further refines the extent of the preemption that Congress has already explicitly provided. We thus see no conflict between the FCC's ability to interpret § 332(c)(7)(B)'s limitations on state and local government authority and the principle that Congress must unmistakably indicate its intent to preempt a power traditionally exercised by state or local governments because Congress has indicated a preference for federal preemption of state and local laws governing the time frames for wireless zoning decisions.[117]

Finally, the cities argue that "[u]ntil its dramatic shift in the [Declaratory Ruling], the FCC had long recognized the statutory limits on its jurisdiction under Section 332(c)(7)." The cities claim the FCC's exercise of authority to interpret § 332(c)(7)(B)(ii) and (v) conflicts with the FCC's own longstanding interpretation of its jurisdiction. The cities note that the Supreme Court, in *New Process Steel, L.P. v. NLRB*,[118] made the following observation when interpreting the statute establishing the NLRB's quorum requirements: "That our interpretation of the delegation provision is consistent with the Board's longstanding practice is persuasive evidence that it is the correct one,

---

[117] *Cf. AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 379 n.6 (1999) ("This is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the FCC or the federal courts that draw the lines to which they must hew.").

[118] 130 S. Ct. 2635 (2010).

notwithstanding the Board's more recent view."[119]

We are not persuaded by this argument in this case, however, because the FCC interpretations to which the cities direct us do not adopt the position that the FCC lacks authority to implement § 332(c)(7)(B)'s limitations. For example, in *In re Facilitating the Provision of Spectrum-Based Services to Rural Areas and Promoting Opportunities for Rural Telephone Companies to Provide Spectrum-Based Services*, the FCC did observe that "Section 332(c)(7) generally preserves local authority over land use decisions, and limits the Commission's authority in this area,"[120] but a review of that order makes clear that the limitation to which the FCC was referring was § 332(c)(7)(B)(v)'s grant of exclusive jurisdiction to the courts over most disputes arising under § 332(c)(7)(B).[121] The FCC's order in *In re Cingular Wireless L.L.C.*[122] and a letter from the chief of the FCC's Wireless Telecommunications Bureau[123] similarly contained observations on the limits of the FCC's authority to consider petitions challenging specific state or local government action. As already discussed, that § 332(c)(7)(B)(v) vests exclusive jurisdiction in the courts to consider specific disputes arising under § 332(c)(7)(B) does not limit the FCC's ability to implement § 332(c)(7)(B)'s limitations. Thus, the FCC's acknowledgment of this limitation hardly suggests that the FCC also recognized a limit on its authority under § 201(b).

## D

For the above reasons, we conclude the FCC is entitled to deference with

---

[119] *Id.* at 2641-42.

[120] 19 FCC Rcd. 24084 ¶ 123 (2004).

[121] *Id.* at n.368.

[122] 18 FCC Rcd. 13126 ¶ 21 (2003).

[123] Letter from Michele C. Farquhar to Mr. Thomas E. Wheeler (Jan. 13, 1997), 1997 WL 14744.

respect to its exercise of authority to implement § 332(c)(7)(B)(ii) and (v).  The language of § 332(c)(7) is silent with respect to the FCC's power to exercise this authority, and none of the cities' arguments convince us that the FCC's interpretation of its statutory authority is impermissible.  The FCC thus did not lack statutory authority to establish the 90- and 150-day time frames.

## VI

We now consider whether the 90- and 150-day time frames themselves also pass muster under *Chevron*.  The time frames represent the FCC's attempt to implement § 332(c)(7)(B)(ii) and (v).  Section 332(c)(7)(B)(ii) requires state and local governments to "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."  Section 332(c)(7)(B)(v) provides that any person adversely affected by a state or local government's "failure to act" may "within 30 days after such . . . failure to act, commence an action in any court of competent jurisdiction."  In the Declaratory Ruling, the FCC defined "a reasonable period of time" for purposes of § 332(c)(7)(B)(ii) as, presumptively, "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications."[124]   The FCC also concluded that a lack of decision within these time frames would constitute a failure to act that would be actionable under § 332(c)(7)(B)(v).[125]

## A

As usual, we begin with the statutory text.  The FCC claims that § 332(c)(7)(B)(ii) and § 332(c)(7)(B)(v) are ambiguous and subject to FCC

---

[124] 24 FCC Rcd. 13994 ¶ 32 (2009).

[125] *Id.*

interpretation. We agree. Specifically, we note that the phrase "a reasonable period of time," as it is used in § 332(c)(7)(B)(ii), is inherently ambiguous.[126] Moreover, because the phrase "a reasonable period of time" serves as a standard for determining when a "failure to act" has occurred under § 332(c)(7)(B)(v), the ambiguity in the phrase leaves room for agency guidance on the amount of time state and local governments have to act on wireless facility zoning applications before their delay constitutes a failure to act under the statute that would trigger § 332(c)(7)(B)(v)'s 30-day limitations period on filing an action in court. We thus owe substantial deference to the FCC's interpretation of these terms, and we will disturb the FCC's interpretation only if it represents an impermissible construction of § 332(c)(7)(B)(ii) and (v).[127]

**B**

The cities raise a number of arguments relevant to the reasonableness of the FCC's establishment of the 90- and 150-day time frames. They claim the FCC's time frames represent unreasonable interpretations of the statute because they: (1) shift the burden to state and local governments to demonstrate in court that a delay in acting on a wireless facility zoning application was reasonable, thus reversing the presumption against preemption; (2) seek to force state or

---

[126] *See Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 777 (6th Cir. 2008) (observing that descriptors such as "reasonable" and "unreasonable" are subject to multiple constructions); *Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003) ("[T]he generality of these terms—unjust, unreasonable—opens a rather large area for the free play of agency discretion." (internal quotation marks omitted)); *Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 204 (D.C. Cir. 1994) ("Because 'just,' 'unjust,' 'reasonable,' and 'unreasonable' are ambiguous statutory terms, this court owes substantial deference to the interpretation the Commission accords them.").

[127] *See, e.g.*, *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010); *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 457-58 (D.C. Cir. 2000) ("If we find the statute silent or ambiguous with respect to the precise question at issue, we proceed to the second step of *Chevron* analysis, asking whether the agency's answer is based on a permissible construction of the statute. At this stage of *Chevron* analysis, we afford substantial deference to the agency's interpretation of statutory language." (internal quotation marks and citations omitted)).

No. 10-60039

local government action by creating a heightened threat of litigation; (3) impose new application completeness requirements; (4) create a national standard for what constitutes a "reasonable period of time"; and (5) contravene Congressional intent by giving preferential treatment to the wireless industry in the processing of zoning applications. After considering these arguments, however, we conclude that the FCC's 90- and 150-day time frames are based on a permissible construction of § 332(c)(7)(B)(ii) and (v) and are thus entitled to *Chevron* deference.

### 1

First, the cities observe that courts addressing actions brought pursuant to § 332(c)(7)(B)(v) have placed the burden on the plaintiff to prove that a state or local government has failed to comply with one of § 332(c)(7)(B)'s requirements.[128] They claim the FCC's time frames reverse this burden by creating a presumption that a state or local government that fails to act on a zoning application within the applicable 90- or 150-day time frame has "failed to act" under § 332(c)(7)(B)(v). The result, they argue, is that "the 'presumption against preemption' is replaced with a presumption *for* preemption" because the burden of proof rests on state and local governments to prove the reasonableness of their delay in cases in which they have failed to act within the time frames.

We disagree with this characterization of the effect of the FCC's presumption because it misstates the typical effect of a presumption in a civil proceeding. Federal Rule of Evidence 301, for example, describes the effect of presumptions in civil proceedings in federal court. It provides:

> In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has

---

[128] *See, e.g., U.S. Cellular Corp. v. City of Wichita Falls, Tex.*, 364 F.3d 250, 256 (5th Cir. 2004) ("The plaintiff carries the burden of proving that no substantial evidence supports the local government's decision [in an action challenging the decision under § 332(c)(7)(B)(iii)].").

No. 10-60039

> the burden of producing evidence to rebut the presumption. But this
> rule does not shift the burden of persuasion, which remains on the
> party who had it originally.[129]

We have held that Rule 301 adopts a "bursting-bubble" theory of presumption,
under which "the *only* effect of a presumption is to shift the burden of producing
evidence with regard to the presumed fact."[130] "If the party against whom the
presumption operates produces evidence challenging the presumed fact, the
presumption simply disappears from the case."[131] In other words, once a party
introduces rebuttal evidence sufficient to support a finding contrary to the
presumed fact, the presumption evaporates, and the evidence rebutting the
presumption, and its inferences, must be "judged against the competing evidence
and its inferences to determine the ultimate question at issue."[132] The burden
of persuasion with respect to the ultimate question at issue remains with the
party on whom it originally rested.[133]

We see no reason why this general theory of presumptions does not also
apply to the presumption created by the FCC's Declaratory Ruling. In an action
seeking to enforce § 332(c)(7)(B)(ii) against a state or local government, the
ultimate burden of persuasion remains with the wireless facilities provider to

---

[129] FED. R. EVID. 301.

[130] *Pennzoil Co. v. FERC*, 789 F.2d 1128, 1136 (5th Cir. 1986).

[131] *Id.* at 1136-37.

[132] *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 288 (3d Cir. 2006) (internal quotation marks omitted).

[133] *See* FED. R. EVID. 301 (noting "the burden of persuasion . . . remains on the party who had it originally"); *cf. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) ("It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. In this regard it operates like all presumptions, as described in Federal Rule of Evidence 301." (internal quotation marks, brackets, and citations omitted)).

demonstrate that the government unreasonably delayed action on an application.  True, the wireless provider would likely be entitled to relief if it showed a state or local government's failure to comply with the time frames and the state or local government failed to introduce evidence demonstrating that its delay was reasonable despite its failure to comply.  But, if the state or local government introduced evidence demonstrating that its delay was reasonable, a court would need to weigh that evidence against the length of the government's delay—as well as any other evidence of unreasonable delay that the wireless provider might submit—and determine whether the state or local government's actions were unreasonable under the circumstances.

**2**

The cities also argue that the 90- and 150-day time frames represent unreasonable interpretations of the statute because the time frames subject state and local governments to a heightened risk of litigation by wireless service providers.  The cities suggest that this heightened risk "affects" state or local governments and thus violates § 332(c)(7)(A).  This argument is not convincing, however, because, although the FCC's time frames do provide some amount of certitude as to when a state or local government has unreasonably failed to act under § 332(c)(7)(B)(ii), the time frames do not create any new risk of litigation independent from the risk state or local governments have always faced as a result of  § 332(c)(7)(B)(v)'s vesting of jurisdiction in the courts to hear disputes arising under § 332(c)(7)(B)(ii).  As we have already discussed, § 332(c)(7)(A) does not apply to § 332(c)(7)(B)'s restrictions on state and local governments.

**3**

The cities also take issue with the FCC's determination that the 90- and 150-day time frames do not start to run with respect to an application if the application is incomplete and the state or local government alerts the applicant to the application's incompleteness within 30 days of its submission.  The effect

of this determination, they argue, is the imposition of a new "completeness requirement" that has no basis in § 332(c)(7)(B)(ii).

We disagree. The FCC's decision to toll the time frames when a state or local government confronts an incomplete application accounts for the fact that the completeness of an application affects the ability of a decisionmaker to act on that application. The FCC recognized that in such cases, a state or local government could not be presumed to have acted unreasonably simply because the government failed to act on an application within the time frames. The FCC also recognized, however, that a state or local government that confronted an incomplete application, but delayed alerting the applicant to the deficiencies in the application, should be presumed to have acted unreasonably if the government ultimately did not act on the application within the time frames. Thus, the FCC allowed for tolling of the 90- and 150-day time frames in cases of incompleteness, but also imposed a separate time frame for state and local governments to notify applicants of incompleteness in order to prevent state and local governments from manipulating the process. This does not strike us as an unreasonable application of § 332(c)(7)(B)(ii).[134]

To the extent the cities argue that state and local governments often will not become aware of a need for more information with respect to an application until after the FCC's 30-day tolling period has expired, we again emphasize the limited effect of the FCC's 90- and 150-day time frames. The time frames represent the FCC's interpretation of what would generally constitute an unreasonable delay under § 332(c)(7)(B)(ii), but a court will ultimately decide whether state or local government action is unreasonable in a particular case.

---

[134] *Cf. Alliance for Cmty. Media v. FCC*, 529 F.3d 763, 780 (6th Cir. 2008) ("Courts are 'generally unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem.'" (alteration in original) (quoting *Covad Comm. Co. v. FCC*, 450 F.3d 528, 541 (D.C. Cir. 2006))).

No. 10-60039

Accordingly, if a state or local government fails to meet the applicable time frame because deficiencies in an application become apparent more than 30 days after the application was filed, the government would remain free to argue that it acted reasonably under the circumstances.

**4**

Fourth, the cities contend the 90- and 150-day time frames are not reasonable interpretations of § 332(c)(7)(B)(ii) because the time frames apply nationwide and thus cannot be squared with § 332(c)(7)(B)(ii)'s command that what constitutes a "reasonable period of time" should be determined by taking into account "the nature and scope of such request." This is an individualized determination, the argument goes, and a national standard is incompatible with such a scheme. We cannot agree with the cities on this point, however, because, as we have already made clear, the 90- and 150-day time frames do not eliminate the individualized nature of an inquiry into the reasonableness of a state or local government's delay. The time frames do provide the FCC's guidance on what periods of time will generally be "reasonable" under the statute, of course, and they might prove dispositive in the rare case in which a state or local government submits no evidence supporting the reasonableness of its actions. But in a contested case, courts must still determine whether the state or local government acted reasonably under the circumstances surrounding the application at issue.

**5**

Finally, the cities claim the FCC's time frames are unreasonable interpretations of § 332(c)(7)(B) because they will require state and local governments to give wireless service providers preferential treatment in the form of prioritized review of wireless zoning applications. They claim this result clearly conflicts with Congress's intent, and for support, point to the following passage from the Conference Report: "It is not the intent of this provision to give

45

preferential treatment to the personal wireless service industry in the processing of requests, or to subject their requests to any but the generally applicable time frames for zoning decision[s]."[135]  However,  nothing in the FCC's time frames necessarily requires state and local governments to provide greater preference to wireless zoning applications than is already required by § 332(c)(7)(B)(ii) itself.  The statute provides a clear directive that state and local governments must rule on wireless zoning applications in a "reasonable amount of time," and that directive inherently preferences the personal wireless service industry because other types of state and local zoning decisions are not subject to such a standard.[136]  Moreover, as already noted, a state or local government that fails to act on an application within the FCC's time frames remains free to argue that it acted diligently with respect to the application, and such an argument might include reference to the inability of the government to address the wireless zoning application within the time frames without neglecting its other business.[137]

**6**

In short, we believe the cities' challenges to the reasonableness of the 90- and 150-day time frames stem from a misunderstanding of the time frames' effect on the wireless zoning application process.  We do not read the Declaratory

---

[135] H.R. REP. NO. 104-458, at 208 (1996) (Conf. Rep.).

[136] *Cf. Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 396 (5th Cir. 2008) (observing that appeals to statutory purpose only overcome an agency's interpretation of a statute's text when "the statute's purpose is so clear and compelling, despite tension with its plain text, that it leaves no doubt as to Congress's intent").

[137] *Cf. SNET Cellular, Inc. v. Angell*, 99 F. Supp. 2d 190, 198-99 (D.R.I. 2000) (concluding that a zoning board was not dilatory in its treatment of an application because the board considered applications in the order in which they were filed, hearings on the application were postponed due to the protracted nature of hearings on a different application, and the zoning board tried to expedite matters by supplementing its monthly meetings with several special meetings regarding the application).

No. 10-60039

Ruling as creating a scheme in which a state or local government's failure to meet the FCC's time frames constitutes a *per se* violation of § 332(c)(7)(B)(ii). The time frames are not hard and fast rules but instead exist to guide courts in their consideration of cases challenging state or local government inaction. It is true that courts considering such cases will owe deference to the FCC's determination that a state or local government's failure to comply with the time frames constitutes unreasonable delay. In the rare case in which a state or local government fails to submit any evidence demonstrating the reasonableness of its inaction, the government's failure to comply with the FCC's time frames will likely be dispositive of the question of the government's compliance with § 332(c)(7)(B)(ii). The more likely scenario, however, is that a state or local government that has failed to act within the time frames will attempt to rebut the presumption of unreasonableness by pointing to reasons why the delay was reasonable. It might do so by pointing to extenuating circumstances, or to the applicant's own failure to submit requested information. Or it might note that it was acting diligently in its consideration of an application,[138] that the necessity of complying with applicable state or local environmental regulations occasioned the delay,[139] or that the application was particularly complex in its nature or scope.[140] All of these factors might justify the conclusion that a state or local government has acted reasonably notwithstanding its failure to comply with the FCC's time frames. We do not list these possibilities to establish a definitive list

---

[138] *See id.*

[139] *See N.Y. SMSA Ltd. P'ship v. Town of Riverhead*, 45 F. App'x 24, 26-27 (2d Cir. 2002) (unpublished).

[140] *See Omnipoint Commc'ns Enters., Inc. v. Town of Amherst, N.H.*, 74 F. Supp. 2d 109, 122 (D.N.H. 1998) ("The [Zoning Board of Adjustment] chairman noted that the ZBA had received more information relating to the plaintiff's applications than any previous applications. In addition, the volume of public response to the applications was extremely high.").

47

No. 10-60039

of the circumstances that might cause a state or local government to have acted reasonably, however, as adjudications of specific disputes under the statute will ultimately determine how specific circumstances relate to the FCC's time frames. Our point here is simply to note both that a variety of circumstances can affect the consideration and determination of a wireless facility zoning application, and that these circumstances remain relevant even after the FCC issued its time frames.

## VII

The cities also claim the FCC's establishment of the 90- and 150-day time frames was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[141] Agency action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[142]

Our scope of review under the arbitrary and capricious standard is narrow, and we cannot substitute our own judgment for that of the agency.[143] "We limit our review to whether the agency articulated a rational connection between the facts found and the decision made, and it is well-settled that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."[144] "Our

---

[141] *See* 5 U.S.C. § 706; *Defensor v. Meissner*, 201 F.3d 384, 386 (5th Cir. 2000) ("Under the Administrative Procedure Act, agency action is reviewed solely to determine whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

[142] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[143] *Id.*

[144] *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008) (internal quotation marks and citations omitted).

48

mandate is not to 'weigh the evidence pro and con but to determine whether the agency decision was based on a consideration of relevant factors and whether there was a clear error of judgment.'"[145]  "[I]f the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary or capricious."[146]

We cannot conclude that there has been a clear error of judgment in this case.  The record reflects the FCC issued the Declaratory Ruling only after receiving dozens of comments from wireless service providers, local zoning authorities, and other interested parties, and many of those comments supported the FCC's conclusion that wireless service providers often face lengthy delays in the consideration of collocation and new wireless facility zoning applications. CTIA's petition, for example, claimed that a survey of its members indicated that of the 3,300 wireless siting applications currently pending before local governments, 760 had been pending for more than one year and 180 had been pending for over three years.  Comments from wireless services providers supported CTIA's claims. T-Mobile USA, Inc., for example, submitted comments indicating that over thirty percent of T-Mobile's currently pending proposals involving new wireless facilities had been pending for more than one year and that nearly one-third of its currently pending collocation applications had been pending for more than one year. Verizon Wireless submitted comments claiming that, of the over 350 non-collocation zoning requests it currently had pending, over half had been pending for more than six months and nearly 100 had been pending for more than one year.  Alltel Communications, LLC, submitted comments indicating a number of Alltel's collocation and new facility applications had been pending with local zoning authorities for over one year.

---

[145] *Id.* (quoting *Delta Found., Inc. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002)).

[146] *Harris v. United States*, 19 F.3d 1090, 1096 (5th Cir. 1994).

No. 10-60039

The cities argue that this evidence exaggerates the proportion of applications that face significant delay with local zoning boards because, by comparing the number of applications facing significant delays to the number of applications currently pending with local zoning authorities, the evidence fails to account for the applications that local zoning authorities have already approved. The cities also seize on comments by wireless service providers indicating that the vast majority of local governments act on wireless zoning applications in a timely manner. Taken together, the cities argue that this evidence demonstrates that there was no real need for agency action in this case.

We believe the cities' argument is an invitation for this court to independently weigh the evidence before the agency, an undertaking that would exceed the scope of our judicial review. Whether the FCC's decision in this case was ideal, or even necessary, is irrelevant to the question of whether it was arbitrary and capricious "so long as the agency gave at least minimal consideration to the relevant facts as contained in the record."[147]  Here, the administrative record demonstrates that wireless service providers in many areas of the country face significant delays with respect to their facilities zoning applications, and we believe the FCC properly considered this information and determined that both wireless service providers and zoning authorities would benefit from FCC guidance on what lengths of delay would generally be unreasonable under § 332(c)(7)(B)(ii). This conclusion was not arbitrary and capricious.

## VIII

Finally, one of the intervenors in Arlington's petition for review, the EMR Policy Institute (EMR), presents the claim that the FCC acted arbitrarily and capriciously when it dismissed a cross-petition that EMR filed during the agency

---

[147] *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

No. 10-60039

proceedings. In its petition, EMR claimed FCC regulations concerning the radio frequency emissions of personal wireless facilities were inadequate and requested that the FCC interpret § 332(c)(7)(B)(iv) to allow state and local governments to restrict the siting of personal wireless facilities on the basis of environmental factors that EMR claimed the FCC failed to address in its regulations.[148] We decline to consider EMR's argument for the same reason we refuse to consider the additional arguments raised by San Antonio—as an intervenor, EMR cannot present issues that are not raised in Arlington's petition for review.[149]

*    *    *

For the above reasons, we DENY Arlington's petition for review. We DISMISS San Antonio's petition for review because we lack jurisdiction to consider it.

---

[148] Section 332(c)(7)(B)(iv) preempts state or local regulation of the placement of personal wireless facilities "on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions."

[149] *Brazoria Cnty., Tex. v. EEOC*, 391 F.3d 685, 689 (5th Cir. 2004).

51