

**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

## GUAM POLICE DEPARTMENT MAJOR FRED M. CHARGUALAF,
Petitioner-Appellant,

**v.**

## GOVERNMENT OF GUAM RETIREMENT FUND,
Respondent-Appellee.

Supreme Court Case No.: CVA19-019
Superior Court Case No.: SP0007-18

## OPINION

## Cite as: 2021 Guam 17

Appeal from the Superior Court of Guam
Argued and submitted on February 12, 2021
Via Zoom video conference

Appearing for Petitioner-Appellant:
Joshua D. Walsh, *Esq.*
Razzano Walsh & Torres, P.C.
139 Murray Blvd., Ste. 100
Hagåtña, GU 96910

Appearing for Respondent-Appellee:
Joanne L. Grimes, *Esq.*
Carlsmith Ball LLP
1001 Bishop Street, Ste. 2100
Honolulu, HI 96813

Vincent C. Camacho, *Esq.*
Camacho Calvo Law Group LLC
356 E. Marine Corps Dr., Ste. 201
Hagåtña, GU 96910

**E-Received**
11/30/2021 11:04:22 AM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and ALEXANDRO C. CASTRO, Justice *Pro Tempore*.

**CARBULLIDO, C.J.:**

**[1]** Petitioner-Appellant Major Fred M. Chargualaf of the Guam Police Department appeals a decision of the Superior Court upholding a Declaratory Ruling by the Government of Guam Retirement Fund, which declined to adopt Major Chargualaf's interpretation of statutes relating to the definition of "average annual salary" for the computation of pension annuities. Major Chargualaf appeals on the grounds that the trial court's interpretation of the relevant statutes is incorrect and that his due process rights were violated when he was denied a hearing by the Government of Guam Retirement Fund and discovery by the Superior Court. We disagree and affirm the judgment of the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**[2]** The primary facts are not disputed. Fred M. Chargualaf has been employed by the Guam Police Department (GPD) since 1984 and holds the rank of Major. He is enrolled in the Government of Guam Retirement Fund (GGRF) Defined Benefit Plan. While Major Chargualaf was employed by GPD, the Guam Legislature enacted certain pay increases for which Major Chargualaf was later awarded several lump-sum payments as retroactive compensation. In 2013, he received $22,848.63 "that was attributable to services he performed in, and credited to, the years 2000–2008." Record on Appeal ("RA"), tab 11 (Decl. Joshua D. Walsh, Aug. 31, 2018), Ex. B (Bd. Dirs.' Dec., Dec. 27, 2017). Major Chargualaf also received $23,886.28 in 2013, $23,886.28 in 2014, and $2,894.38 in 2015 "that was attributable to Law Enforcement Officer ("LEO") services performed over, and credited to, the years 2009–2013." *Id.* Those lump-sum amounts were not tied to any credited service performed in the years he received those amounts. The

amounts of these lump sums are undisputed, and both parties agree that the lump sums were awarded as retroactive compensation.

[3]     In contemplation of future retirement, Major Chargualaf "asked the Fund to provide him with an estimate of the annuity benefits he would receive upon his retirement, computed as of an assumed future retirement date." RA, tab 5 at 2 (V. Answer to Pet., Apr. 17, 2018). As part of its calculations and under its interpretation of the requirements of 4 GCA § 8122(a), the Fund determined that Major Chargualaf's "average annual salary" for purposes of calculating his retirement annuity would be approximately $110,440.95. RA, tab 11, Ex. B (Bd. Dirs.' Dec.) (average annual salary chart).[1] GGRF arrived at this figure using Major Chargualaf's base salary for the years 2013, 2014, and 2015, but not including the lump-sum payments received because "average annual salary is inextricably tied to [an employee's] performance of creditable service rather than to the timing of payroll receipts," and the lump sums in question were "not tied to any credited service" in the years in which they were paid. RA, tab 11, Ex. B (Bd. Dirs.' Dec.).

[4]     Major Chargualaf disagreed, believing that the relevant statutes required his annuity to be calculated using his W-2GUs, to include the retroactive amounts paid to him in 2013, 2014, and 2015 as part of the "salaries" of the years in which they were received. RA, tab 39 at 2 (Dec. & Order, Aug. 27, 2019). He submitted a Verified Petition for Declaratory Ruling to GGRF under 2 Guam Admin. R. & Regs. ("GAR") § 3101(5), asking GGRF to declare that his annuity upon retirement should be calculated accordingly. The GGRF Board of Directors issued a decision on Major Chargualaf's request for a declaratory ruling, declining to adopt his interpretation. In the decision, GGRF informed Major Chargualaf that the decision of the Board was final and "not

---

[1] In its Supplemental Excerpts of Record, GGRF included the Verified Petition for Declaratory Ruling of April 14, 2017, an exhibit of which contained a different figure of approximately $105,600. However, this document is not part of the record on appeal, and litigants are reminded that they cannot include in their excerpts of record any documents which do not form part of the record.

subject to reconsideration," but that he had the "right to request judicial review of the Board's decision in accordance with 5 GCA § 9241." RA, tab 11, Ex. B (Bd. Dirs.' Dec.).

[5] Major Chargualaf filed a Verified Petition for Writ of Mandate, asking the Superior Court to overturn the decision of GGRF and adopt an interpretation of the relevant statutes that would include lump-sum payments in the salary of the years in which they were received. During a scheduling hearing, Major Chargualaf asked the court to entertain a motion for discovery, which GGRF opposed because there was no factual dispute but merely a legal question of statutory interpretation. The court asked Major Chargualaf to brief the discovery issue alongside his brief on the merits, but ultimately the court did not address the request for discovery in its Decision and Order denying the petition. This appeal followed.

## II. JURISDICTION

[6] This court has jurisdiction over an appeal from a final judgment of the Superior Court of Guam under 48 U.S.C.A. § 1424-1(a)(2) (Westlaw through Pub. L. 117-57 (2021)) and 7 GCA §§ 3107 and 3108(a) (2005). However, the trial court did not enter a separate document setting forth the entry of a final judgment when the Notice of Appeal was filed on September 25, 2019, as required by Rule 58(a)(1) of the Guam Rules of Civil Procedure. If no separate judgment is entered, a judgment may be effectively entered, for the purpose of the separate document rule, 150 days after entry on the docket of the underlying Decision and Order. Guam R. Civ. P. 58(b)(2)(B); *Agana Beach Condo. Homeowners' Ass'n v. Untalan*, 2015 Guam 35 ¶ 10. The Superior Court's Decision and Order denying Appellant's Verified Petition for Writ of Mandate resolved all issues in the litigation and was entered on August 27, 2019, meaning that the judgment was effectively entered 150 days later on January 24, 2020. Major Chargualaf filed his Notice of Appeal on September 25, 2019. Although this was prior to the effective entry of judgment, the appeal was

timely because Guam Rule of Appellate Procedure 4(a)(2) treats a notice of appeal filed after the announcement of a decision or order but before the entry of judgment as filed on the date of and after the entry. *Agana Beach*, 2015 Guam 35 ¶ 10. Our jurisdiction is preserved despite the lack of a renewed notice of appeal. *Id.*

### III.  STANDARD OF REVIEW

**[7]**      Issues of statutory interpretation are reviewed *de novo*, including an agency's interpretation of a statute. *Ada v. Guam Tel. Auth.*, 1999 Guam 10 ¶ 10. We generally review the denial of a petition for writ of mandate for an abuse of discretion. *Agana Beach*, 2015 Guam 35 ¶ 12. "But where there are no facts in dispute and the questions presented for review are strictly questions of law[,] the court's review is *de novo*." *Guam Election Comm'n v. Responsible Choices for All Adults Coal.*, 2007 Guam 20 ¶ 23 (citing *Guam Fed'n of Teachers ex rel. Rector v. Perez*, 2005 Guam 25 ¶ 13).

**[8]**      Generally, "[the trial] court's legal conclusion that [an appellant's] due process rights were not violated by an unfair administrative hearing is reviewed *de novo*." *Perez v. Civil Serv. Comm'n (Guam Dep't of Educ.)*, 2018 Guam 25 ¶ 26 (second alteration in original) (quoting *Sule v. Guam Bd. of Dental Exam'rs*, 2008 Guam 20 ¶ 11). Although no administrative hearing was conducted, the question of whether GGRF's determination violated the due process rights of Major Chargualaf is likewise reviewed *de novo*. *See Responsible Choices*, 2007 Guam 20 ¶ 24 ("Whether a constitutional right has been violated is considered *de novo*.").

### IV.  ANALYSIS

**A. The Trial Court Did Not Err in Upholding GGRF's Interpretation of the Relevant Statutes on the Calculation of Average Annual Salary in Relation to Retirement Benefits**

**[9]**      The primary issue is the correct interpretation of 4 GCA § 8104 and related provisions as they pertain to the calculation of annuities due under the GGRF Defined Benefit Plan—a question

of law.  The parties do not disagree as to the essential facts: Major Chargualaf is a member of the Defined Benefit Plan and will be eligible to receive an annuity upon retirement.  The amounts earned by Major Chargualaf also are not disputed.  Thus, *de novo* review is appropriate.

[10]     Upon *de novo* review, we affirm the decision of the Superior Court because (1) GGRF's determination is not entitled to *Chevron* deference; (2) the court was not limited to the rationale forwarded by GGRF; (3) the plain language of the statute is ambiguous; and (4) the ambiguity can be resolved through the absurdity doctrine and legislative intent.

### 1.  No deference due to GGRF's determination

[11]     Although the theory was advanced before the Superior Court, GGRF does not challenge in its appellate brief the Superior Court's finding that *Chevron* deference does not apply.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  The *Chevron* doctrine applies "only where the legislature 'understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.'"  *Port Auth. of Guam v. Civil Serv. Comm'n (Javelosa)*, 2018 Guam 9 ¶ 8 (quoting *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013)).  In other words, "*Chevron* deference will apply only where the legislature expressly or implicitly intended it to apply," and "interpretive rules" generally do not enjoy such deference.  *Id.*  As the trial court explained, 4 GCA §§ 8139 and 8139.1 "do not appear to be [a] grant of authority by the legislature for the GGRF to interpret ambiguities in the terms defined in [4 GCA §] 8104, but merely the [sic] authorized the GGRF to freely control its operations and granted latitude in how it would ensure the fund remains solvent."  RA, tab 39 at 6 (Dec. & Order, Aug. 27, 2019).  The trial court held that *Chevron* should not apply because "[i]t is clear from the plain language of Section 8104 that

the Legislature intended to set specific definitions which would be used by the board in determining annuity calculations." *Id.* at 6–7.

**[12]** We agree that *Chevron* deference does not apply. The definitions do not contemplate ambiguities that should be resolved by GGRF; rather, they are intended as a complete expression by the legislature. The definitions of words and phrases in section 8104 apply "unless a different meaning is clearly indicated by the context." 4 GCA § 8104 (as amended by Pub. L. 35-068:2 (Feb. 13, 2020)). Language within the "Statement of Legislative Concern" requires GGRF to submit to the legislature any "recommendations of amendments that need be made to the law establishing the Fund to protect and preserve the actuarial soundness of the Fund for the benefits of all its members," 4 GCA § 8101.1(b) (2005), suggesting that GGRF alone was not given discretion to resolve definitional ambiguities even if doing so would protect the Fund. Thus, the Superior Court was correct in finding that *Chevron* deference does not apply.[2]

## 2. The Trial Court Was Not Limited to the Rationale Forwarded by the Agency for Upholding Its Interpretation of a Statute

**[13]** Major Chargualaf cites *Perez v. Civil Service Commission (Guam Department of Education)*, 2018 Guam 25, to argue that the trial court was limited to a "binary choice" between "accept[ing] the agency's determination based upon the articulated rationale from the agency, or reject[ing] the agency determination because the agency's determination is flawed." Appellant's Br. at 23 (Jan. 13, 2020). Accordingly, Major Chargualaf argues it was error for the trial court to

---

[2] GGRF alternatively argues that its determination is due deference because of its status as a trustee. This argument fails for the same reason that *Chevron* deference fails—there is no support for the notion that the legislature intended to vest GGRF with discretion to resolve definitional ambiguities on its own. GGRF quotes *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), for the proposition that "[a] trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable," Appellee's Br. at 19 (Feb. 26, 2020) (quoting *Firestone*, 489 U.S. at 111), but offers no proof to its assertion that the "Legislature explicitly intended to confer great discretion to the Fund in implementing Chapter 8 of Title 4 of the Guam Code Annotated," *id.* at 20. Without a showing of vested discretion, GGRF is not entitled to deference as a trustee.

go "beyond the developed record" and confirm GGRF's interpretation not based on a plain language analysis, as GGRF had argued, but based on the absurdity doctrine, a theory that GGRF had not advanced. Appellant's Br. at 2, 22–23.

[14]    However, this argument results from a misreading of a quote from *Perez* that a reviewing court "may not substitute its views for those of the [agency], but instead must accept the [agency's] findings unless they are contrary to law, irrational, or unsupported by substantial evidence." *Perez*, 2018 Guam 25 ¶ 9 (alterations in original) (quoting *Fagan v. Dell'Isola*, 2006 Guam 11 ¶ 11). When the quote is followed to its source in *Fagan*, and indeed to the Ninth Circuit case which *Fagan* adopted, it is clear that the "findings" referenced were merely findings of fact; the full quote from *Fagan* makes clear that an agency's conclusions of law are reviewed by the trial court *de novo*, meaning that the trial court would not be limited to the agency's interpretation:

> The trial court was required to review *de novo* the Commission's conclusions of law. The trial court was also required to affirm the Commission's findings of fact, and any conclusions resulting therefrom, if supported by substantial evidence. This is because a reviewing body "may not substitute its views for those of the [agency], but instead must accept the [agency's] findings unless they are contrary to law, irrational, or unsupported by substantial evidence."

*Fagan*, 2006 Guam 11 ¶ 11 (alterations in original) (quoting *Alcala v. Dir., Office of Workers Comp. Programs*, 141 F.3d 942, 944 (9th Cir. 1998)).

[15]    Major Chargualaf also cites to *Motor VehicleManufacturers Ass'n of U.S., Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983), for the proposition that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Appellant's Br. at 23 (quoting *State Farm*, 463 U.S. at 50). However, that case was in the context of agency rulemaking and rescission of existing rules where delegated by the legislature to the discretion of the agency, while this matter is closer to administrative adjudication. *See City of Arlington, Tex. v. FCC*, 668 F.3d 229, 241 (5th Cir. 2012) (finding that declaratory ruling by FCC establishing

what constituted reasonable time period under Telecommunications Act was "result of adjudication" rather than notice-and-comment rulemaking). The agency action in *State Farm* was the rescission of automotive safety regulations, and the *post hoc* rationalizations upon which the court could not uphold the agency's actions were highly fact-driven assertions unsupported by the record. *See State Farm*, 463 U.S. 29. Conversely, the basis of GGRF's decision here has always been the retirement fund statutes at 4 GCA § 8101 *et seq.* The trial court's use of a canon of statutory interpretation different from that advanced by GGRF to resolve a pure question of law is a permissible aspect of *de novo* review. *See Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regul. Comm'n*, 2010-NMSC-013, ¶ 50, 148 N.M. 21, 229 P.3d 494 (holding that because statutory construction is not a matter within appellee's expertise, appellee's construction is not entitled to judicial deference).

[16]     Similarly, Major Chargualaf cites *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), without considering the full context of that decision. *See* Appellant's Br. at 23 (quoting *Chenery Corp.*, 318 U.S. at 87). That case did establish the rule that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," but this only extends to those determinations or actions which the agency alone is authorized to make:

> If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.

*Chenery Corp.*, 318 U.S. at 87–88. Here, statutory interpretation of any ambiguities has not been exclusively entrusted to the discretion of GGRF, and the trial court—and, consequently, this court—is not limited to the canons of statutory interpretation initially advanced by GGRF.

### 3. Plain Language Does Not End Inquiry Because Ambiguities Remain

[17]     Statutory interpretation should always begin with the plain language of the statute. *Data Mgmt. Res., LLC v. Office of Pub. Accountability*, 2013 Guam 27 ¶ 17; *Aguon v. Gutierrez*, 2002 Guam 14 ¶ 6. The Superior Court found that the plain language favored Major Chargualaf's interpretation because the language of section 8104(i) defining "[a]verage annual salary" contained "no qualifiers as to amounts that should be excluded, and a plain reading suggests that any and all amounts received in an annum count." RA, tab 39 at 8 (Dec. & Order, Aug. 27, 2019). Nonetheless, the court ultimately found for GGRF because Major Chargualaf's understanding would lead to absurd results and frustrate the intent of the legislature. *Id.* at 7–11; *see infra* Part IV.A.4. Major Chargualaf argues that the Superior Court's determination of the plain language meaning of 4 GCA §§ 8104 and 8122 is "settled" because it "has not been appealed" by GGRF. Appellant's Br. at 9. But issues of statutory interpretation are reviewed *de novo*, *Ada*, 1999 Guam 10 ¶ 10, where "no form of appellate deference is acceptable," *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991). Thus, the Superior Court's legal conclusion on the plain meaning is not dispositive, and this court may reexamine the issue.

[18]     Title 4 GCA § 8122(a) establishes the formula for calculating the basic retirement annuity payable to members of the Defined Benefit Plan using the employee's average annual salary and number of years of credited service,[3] while section 8104 defines the essential terms. "*Service* shall

---

[3] The entire formula is as follows:

> (1) an amount equal to two percent (2.0%) of average annual salary for each of the first ten (10) years of credited service, and two and one-half percent (2.5%) of average annual salary for each year, or part thereof, of credited service over ten (10) years;

> (2) in addition, there shall be added to the amount set forth in Subsection (1) an amount equal to Twenty Dollars ($20.00) multiplied by each year of credited service, the total of which shall then be reduced by an amount equal to one hundredth of one percent (.01%) of said total for each One Dollar ($1.00) that a member's average annual salary exceeds the amount of Six Thousand Dollars ($6,000.00);

mean actual employment by the Government as an employee for salary or compensation or service otherwise creditable as herein provided." 4 GCA § 8104(e). "*Salary* shall mean the amount received by an employee for service which shall include allowances for maintenance at the prescribed rate and any territorial post differential." *Id.* § 8104(i). "*Average annual salary* shall mean the average of the three (3) highest annual salaries received by a member during his years of credited service or Six Thousand Dollars ($6,000) whichever is greater." *Id.* § 8104(j).

[19]     Major Chargualaf urges us to focus on the word "received" within the definition of average annual salary, Appellant's Reply Br. at 17–18 (Mar. 11, 2020), while GGRF places the emphasis on the phrase "during his years of credited service" together with the definition of "service" in section 8104(e) and the requirement that "not more than one (1) year service shall be creditable on account of service rendered during any year." 4 GCA § 8114 (2005); Appellee's Br. at 6–9 (Feb. 26, 2020).  However, both sides neglect to point out the ambiguity raised by the lack of a definition provided for "annual salary" despite its importance within the definition of "average annual salary."

[20]     The crux of the issue appears to be the definition of "annual salary" and whether it should be read as the compensation or "salary" *received* within one year by an employee or what is *earned* within one year.  The "received" within the definition of "average annual salary" does not resolve the issue because it refers to "salaries" received by a member during his or her "years of credited service," but not when such credited service must occur in relation to the salaries to which they are credited.  The ordinary meaning of "salary" tends to connote a regular amount to be paid to an

---

(3) no basic retirement annuity shall exceed eight-five percent (85%) of average annual salary; and

(4) the basic retirement annuity shall not, in any case, be less than One Thousand Two Hundred Dollars ($1,200.00) per year per member.

4 GCA § 8122(a) (as amended by Pub. L. 35-036:XI:4 (Sept. 4, 2019).

employee in a given period for services performed.[4]  Thus, contrary to the holding of the Superior Court, the regular intervals suggested by the ordinary meaning of "salary" seem to support the interpretation of GGRF that lump-sum payments not attributable to the period in which they are paid would not constitute "salary" for the year of payment because it would not be part of the regular agreed compensation.  But we cannot simply substitute the ordinary meaning of salary for that defined by the legislature, even if the statutory definition is more ambiguous than the ordinary meaning.  *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").  With the ambiguity of the provided "salary" definition and absent a definition for "annual salary," the statute does not yield an unambiguous result, and so this court may turn to other canons of statutory construction to fill in the gaps.

### 4.  Major Chargualaf's Interpretation Would Contravene Legislative Intent

[21]    "[N]otwithstanding the deference due the plain-meaning of statutory language, . . . such language need not be followed where the result would lead to absurd or impractical consequences, untenable distinctions, or unreasonable results."  *Sumitomo Constr., Co. v. Gov't of Guam*, 2001 Guam 23 ¶ 17 (quoting *Bowlby v. Nelson*, Civ. No. 83-0096A, 1985 WL 56583, at *2 (D. Guam App. Div. Sept. 5, 1985)).  "Absurdity may result when the legislature drafts a statute using language that is broader and more sweeping than that which the legislature intended."  *Id.*  Here, the statutory definition of "salary" is broader than that in *Black's Law Dictionary* and arguably common understanding because it is defined as the "amount received by an employee for service" with no reference to a fixed or agreed-upon amount or payments at regular intervals.  It would not

---

[4] Black's Law Dictionary defines "salary" as "[a]n agreed compensation for services—esp. professional or semiprofessional services—usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis." *Salary*, *Black's Law Dictionary* (11th ed. 2019).  Merriam-Webster defines "salary" as "fixed compensation paid regularly for services." *Salary*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/salary.

be unreasonable for the court to interpret the broader language of the definition of "salary" in a more limited fashion to carry out legislative intent.

**[22]**   Title 4 GCA § 8101 states:

> The purpose of the [GGRF] is to provide retirement annuities and other benefits for the employees of the government of Guam . . . with the objective of encouraging qualified personnel to enter and remain in the service of the Government, thus effecting economy and efficiency in the administration of the Government.

4 GCA § 8101 (2005).  GGRF argues that Major Chargualaf's interpretation would lead to absurd results because it could cause uneven treatment and differing annuities for members who work the same job at the same salary for the same amount of time, but who, for one reason or another, receive their payments at different times.  *See* Appellee's Br. at 12–13.  Major Chargualaf contends that his own interpretation, although it would lead to outsized annuities for some members, is not an absurd result because "it does not seem so overwhelmingly absurd to believe that a Guam Legislator would choose to provide retirement benefit calculations that would earn favor with members of the retirement fund by increasing the annuity due to them."  Appellant's Br. at 15.  GGRF counters that the potential impact of the interpretation might increase the annuity for some members but might decrease the annuity for others depending on the timing of payments. Appellee's Br. at 14.

**[23]**   GGRF argues that adopting Major Chargualaf's interpretation of the statutes would be "inconsistent with the purposes and polices of the DB plan" to "be able to provide retirement benefits to all enrolled employees and their families" because it could further exacerbate the "unfunded actuarial liability" of GGRF through "pension spiking."  *Id.* at 14–18.  But this should not affect the court's analysis if doing so would contradict legislative intent and usurp the legislative function.  The prudence of a particular public policy remains for the sound judgment of

the legislature. We rely on the plain language of these statutes and the policy considerations contemplated by the legislature.

[24]    The legislature's stated purpose for the Fund is both to effect "economy and efficiency in the administration of the Government" and to incentivize qualified employees to enter the service of the Government by providing for them. 4 GCA § 8101. Although section 8101.1 also reveals a concern for current excessive levels of benefits compared to other government retirement systems, the legislature recognized "it may be necessary to maintain current plan benefit levels for current government employees." *Id.* § 8101.1(a). Thus, the only evidence of legislative concern for the excesses of the DB plan recognizes that it "may be difficult to decrease benefit levels for current members." *Id.* Major Chargualaf was already an existing member when that legislative concern was adopted, so this court is not persuaded by GGRF's alarmist tales of other pension systems that drove localities to bankruptcy when an equally important purpose of motivating qualified employees is also recognized by the legislature.

[25]    Nonetheless, balancing both legislative objectives supports GGRF's interpretation of 4 GCA § 8101 *et seq.* Major Chargualaf's interpretation invites the potential for extreme disproportion between the annuities awarded to similarly situated employees. As an example, a Port Authority employee was reinstated by court order and awarded nearly four years' worth of full back pay. *See Port Auth. of Guam v. Civil Serv. Comm'n (Guevara)*, No. SP0125-13 (Dec. & Order, Sept. 26, 2016); *id.* (Dec. & Order, July 2, 2015), *aff'd*, 2018 Guam 1. If the salary of those four years were paid to the employee in a single year and included as a single year in the computation of "average annual salary," the employee's annuity could double under Major Chargualaf's interpretation compared to that of a similarly situated employee who was not wrongfully terminated. Such an unpredictable method of calculating retirement annuities would

not meet the stated objective of "encouraging qualified personnel to enter and remain in the service of the Government," and disproportionately generous annuities would violate the objective of economic efficiency.  Other sections of the statute show legislative intent to exclude various types of pay from the annuity calculations.  For example, the statute distinguishes "base" and "non-base pay" and precludes non-base pay, including overtime and bonuses, from the calculation of salary except for those employees who elected to contribute the required rate to the Fund for non-base pay before March 29, 1993.  *See* 4 GCA § 8136(c) (2005); RA, tab 11 (Decl. Joshua D. Walsh), Ex. C (OPA Report No. 16-04, May 2016).

[26]    Applying retroactive compensation towards the "salary" of the year in which the compensation was earned rather than received keeps retirement annuities linked to the actual value of service rendered by the member during his or her years of employment and the actual income that supported the employee.  This interpretation is consistent with the objective to motivate employees by providing for them in retirement or other circumstances without increasing the burden on GGRF's resources based on the timing of payments.

**B.  Discovery Was Not Necessary Because No Factual Dispute Existed**

[27]    Major Chargualaf urges this court to find that the trial court erred in failing to address his request for discovery in its Decision and Order.  Appellant's Br. at 29–30.  Major Chargualaf does not request a remand with instructions to order discovery in his prayers for relief.  *See* Appellant's Br. at 33; Reply Br. at 25.  Rather, he asks this court to reverse and direct the trial court to interpret the statute in his favor and grant the writ of mandate.  *Id.*  Major Chargualaf contradicts his own contention that there are factual disputes not resolved by the record on appeal: either the record is incomplete, and discovery must be had before a final determination on the merits of his arguments; or there are no factual disputes, and the remaining questions of law may properly be decided by

this court without further development of the record. Even so, we will briefly address the alleged process errors.

[28]    Major Chargualaf contends he sought discovery "to understand how GGRF came to the conclusion it did in its decision" and ensure it followed the procedures required under Guam's Administrative Adjudication Law ("AAL"). Reply Br. at 20; Appellant's Br. at 30. He points to a West Virginia case which held that the procedural due process rights of a member of a police pension fund required retained counsel, depositions, the opportunity to argue the case before the board, and a written statement outlining reasons for the denial of benefits. *Barron v. Bd. of Trs. of Policemen's Pension & Relief Fund*, 345 S.E.2d 779, 784 (W. Va. 1985). Major Chargualaf highlights that there was no hearing at the agency level, that GGRF made "specific denials of factual claims he raised in his initial Petition,"[5] and that GGRF asserted that its decision to deny the request was "supported by substantial evidence." Appellant's Br. at 30. Major Chargualaf also argues that the inclusion of the affidavit of Paula Blas is a proffer of factual evidence he should be able to test through "the adversarial process or the rigors of discovery." *Id.* at 31.

[29]    GGRF asserts that "there are no questions of fact at issue in the instant case" and that the issue of how the Fund's interpretation of the statute came to be adopted by the Board is "not relevant to the issue at hand." Appellee's Br. at 27–28. GGRF rightly points out that *Barron* is distinguishable in several ways from this case. Appellee's Br. at 26. First, *Barron* involved a determination of eligibility for disability benefits, whereas there was no dispute here about Major Chargualaf's eligibility for the retirement benefit—merely the amount due. Second, the parties in *Barron* disagreed about the extent of the member's disability—a factual determination—while the parties here agree to the basic facts surrounding Major Chargualaf's employment and the nature

---

[5] Major Chargualaf does not identify to which denials he refers, and there does not appear to be any denials of the amount of or circumstances under which the lump-sum payments were made.

and amounts of the payments made to him. Finally, GGRF points out that the employee in *Barron* was prevented from obtaining and presenting evidence supporting his disability, whereas here the "record demonstrates the extensive research conducted by the Fund before issuing its decision." Appellee's Br. at 26. GGRF also highlights that Major Chargualaf's opening brief argued that the affidavit submitted is "of no consequence, since Paula Blas is not the Retirement Fund." Appellee's Br. at 27; Appellant's Br. at 31.

[30]     The record is undeveloped insofar as it is unclear by what process GGRF arrived at its own interpretation of the statute and denied the petition. Yet because we review *de novo* the merits of the statutory interpretation, an analysis of GGRF's own process of interpretation is unnecessary to the disposition of this case.

[31]     There is no factual dispute, and the primary remaining question is a matter of law. Guam Rule of Civil Procedure 26(a)(1)(E)(xx) provides that proceedings for writs are exempt from initial discovery requirements "unless otherwise ordered by the court." Rule 26(b)(1) provides that the scope of discovery includes "any matter, not privileged, that is relevant to the claim or defense of any party," but Rule 26(b)(2) provides that the use of discovery "shall be limited by the court if it determines that: . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit." Other than vague references to GGRF's process, Major Chargualaf does not identify what particular evidence he would request if granted the opportunity. *See* Reply Br. at 23–24. At the hearing, Major Chargualaf requested discovery "to show actually how the Fund has done these calculations in the past, [because] it would be useful for the Court to actually weigh the veracity of the legal contentions of 'This is how we've always done it.'" Transcripts ("Tr.") at 4 (Scheduling Conf., June 26, 2018). If allowed, this could involve extensive discovery of the confidential personnel files of hundreds of Government of Guam employees who are otherwise

not connected to this case. The burden would be substantial, and its likely benefit minimal, given our authority to review the statutory interpretation *de novo* and our primary concern of legislative intent.

[32]    We do not remand and order discovery because Major Chargualaf did not request discovery in his prayers for relief, the primary facts are not disputed, the process by which GGRF adopted its interpretation is only minimally relevant, and allowing discovery on previous GGRF calculations would be unduly burdensome compared to any benefit.

**C. Major Chargualaf's Due Process Rights Were Not Violated When GGRF Issued Its Determination on His Petition for a Declaratory Ruling without Holding a Hearing**

[33]    Finally, Major Chargualaf asserts that his due process rights were violated by the lack of a hearing at the agency level. Appellant's Br. at 3. However, this is not a traditional administrative due process case where the challenged agency decision involves a challenged factual determination along with a legal interpretation. The cases cited by Major Chargualaf all involved disputed facts decided upon by the agency, while the parties here agree to the essential facts of Major Chargualaf's employment status, eventual eligibility for retirement benefits under the DB Plan, the payment he received, and the nature of those payments as retroactive compensation. The only remaining question about the amount of Major Chargualaf's retirement benefits was a matter of law.

[34]    GGRF does not contest that it is subject to Guam's AAL codified in Title 5, Chapter 9 of the Guam Code Annotated, but the procedure of 5 GCA § 9200 *et seq.* applies only when the "legal rights, duties or privileges of specific parties are required by law to be determined after an agency hearing." 5 GCA § 9200 (2005); *see also Perez*, 2005 Guam 25 ¶ 36. Major Chargualaf states, "That body of law contemplates the holding of a hearing before the determination by the

Retirement fund of Major Chargualaf's rights," but he does not identify where under law GGRF declaratory rulings must be made only after an agency hearing. *See* Appellant's Br. at 25.

[35]     Major Chargualaf contends that the Superior Court erred in relying on the fact that 2 GAR § 3101(5), which governs declaratory rulings by GGRF, does not require a hearing because it ignored "the great weight of authority that requires a hearing and notice when vested property rights, such as pension benefits, are at stake." Appellant's Br. at 26. Major Chargualaf appears to argue that Title 2, Chapter 9 of the Guam Administrative Rules and Regulations is unconstitutional because it does not require a hearing before GGRF may issue a declaratory ruling. However, the property right of Major Chargualaf to his retirement benefits has never been in controversy, merely the proper interpretation of an ambiguity in the calculation of that benefit. As GGRF frames it, there was no risk of a deprivation of property, and he had no right to due process protections because "Mr. Chargualaf has not demonstrated any legal claim to his proffered calculation," which should not be conflated with a "vested pension." Appellee's Br. at 21–22.

[36]     Even if the difference in calculated benefits under the disputed interpretations amounted to a vested property interest, due process does not always require an extensive hearing even when property rights are in jeopardy. "The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1082 (9th Cir. 2010) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1988)). In *Carlson v. Perez*, 2007 Guam 6 ¶¶ 35–37, we adopted the standards established by the U.S. Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), that "resolution of the issue whether the administrative procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Mathews*, 424 U.S. at 334. When

determining whether due process has been afforded through the administrative process, courts must consider (1) the private interest affected; (2) the risk of erroneous deprivation of such interest through the recognized procedures, and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and any burdens that additional or substitute requirements would entail. *Id.* at 335.

[37]     Here, Major Chargualaf had a full opportunity through his petition for a declaratory ruling to submit his legal arguments before GGRF as to why his interpretation should prevail. Because no essential facts were at issue, an evidentiary hearing would not have provided any additional information necessary to resolve the pure question of law, and therefore would have provided no additional safeguard to any property interest. Further, 2 GAR § 3101(5)(d) provided an additional procedural safeguard permitting Major Chargualaf to appeal the decision of GGRF to the Superior Court, a right of which he availed himself. Major Chargualaf received a meaningful opportunity to be heard both through the Verified Petition for a Declaratory Ruling before GGRF and the Verified Petition for a Writ of Mandate before the Superior Court, and his due process rights were not violated.

[38]     GGRF was required by 2 GAR § 3101(5)(d) to decide the Petition for Declaratory Ruling within 90 days but failed to issue its decision until 252 days after receiving Major Chargualaf's petition. *See* RA, tab 39 at 4 (Dec. & Order, Aug. 27, 2019); Appellant's Br. at 25. GGRF attributed part of the delay to Major Chargualaf's failure to provide detailed payroll information in his petition and the subsequent need for GGRF to work with the Guam Department of Administration to obtain the necessary records. Appellee's Br. at 24–25. No actual prejudice resulted from the delay because Major Chargualaf has yet to retire and begin receiving benefits, and his right to appeal was not hindered by the delay. *See* RA, tab 39 at 5 (Dec. & Order, Aug.

27, 2019). Although GGRF's decision exceeded the 90-day limit for a response, Major Chargualaf's due process rights were not violated because there was an explanation for the delay and because no actual prejudice resulted.

## V. CONCLUSION

[39] The trial court did not err because (1) GGRF's interpretation of Title 4, Chapter 8 of the Guam Code Annotated is consistent with legislative intent, (2) discovery was unnecessary at the trial court level, and (3) Major Chargualaf was not deprived of due process when GGRF followed the administrative procedures of 2 GAR § 3101. Therefore, we **AFFIRM** the denial of the petition for a writ of mandate.


| /s/ | /s/ |
| --- | --- |
| ROBERT J. TORRES | ALEXANDRO C. CASTRO |
| Associate Justice | Justice *Pro Tempore* |


/s/
F. PHILIP CARBULLIDO
Chief Justice